CIV. NO. 10-1766 (RMU-BMK-RMC)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BENJAMIN BLUMAN, ET AL.,

*Plaintiffs,*

v.

FEDERAL ELECTION COMMISSION,

*Defendant.*

## BRIEF OF *AMICUS CURIAE* ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Erin E. Murphy
Nicholas J. Nelson
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

*Counsel for Amicus Curiae
Illinois Coalition for Immigrant and Refugee Rights*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION  AND STATEMENT OF INTEREST .......................................1

ARGUMENT ...........................................................................2

I.   The First Amendment Applies To All Persons Residing In The
     United States ..................................................................2

    A.   "Permanent Resident" is a Statutory Classification, Not a
          Constitutional One ...................................................3

    B.   Foreign Nationals Who Are "Nonpermanent" Residents By
          Designation Are Often Permanent Residents in Fact...........................7

    C.   Limiting the Reach of the First Amendment to the Statutorily
          Defined Category of "Permanent Residents" Would Be
          Inconsistent With Supreme Court Precedent ...........................................10

II.  First Amendment Classifications Based On "Permanent" Or
     "Nonpermanent" Resident Status Do Not Satisfy Strict Scrutiny.................14

CONCLUSION .......................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bridges v. Wixon,*
326 U.S. 135 (1945)................................................................2, 11, 13

*Buckley v. Valeo,*
424 U.S. 1 (1976)...............................................................................14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)..........................................................................16

*Citizens United v. FEC,*
130 S. Ct. 876 (2010).............................................................14, 15, 20

*Fong Yue Ting v. United States,*
149 U.S. 698 (1893).............................................................................4

*Harisiades v. Shaughnessy,*
342 U.S. 580 (1952).............................................................................4

*Karnuth v. United States*
279 U.S. 231 (1929).............................................................................6

*Katebi v. Ashcroft,*
396 F.3d 463 (1st Cir. 2005).............................................................10

*Kwong Hai Chew v. Colding,*
344 U.S. 590 (1953)........................................................................2, 11

*Martinez-Aguero v. Gonzalez,*
459 F.3d 618 (5th Cir. 2006) ............................................................13

*NAACP v. Button,*
371 U.S. 415 (1963)...........................................................................14

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
525 U.S. 471 (1999)........................................................................2, 11

*Authorities upon which we chiefly rely are marked with asterisks.

*Romanishyn v. Att'y Gen.*,
455 F.3d 175 (3d Cir. 2006) ................................................................. 8

*Savorgnan v. United States*,
338 U.S. 491 (1950) ............................................................................ 11

*United States ex rel. Stapf v. Corsi*,
287 U.S. 129 (1932) .............................................................................. 6

*United States ex rel. Turner v. Williams*,
194 U.S. 279 (1904) .............................................................................. 4

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) ............................................................................ 12

*Werblow v. United States*,
134 F.2d 791 (2d Cir. 1943) ................................................................. 6

## STATUTES

2 U.S.C. § 441a ................................................................................... 17

2 U.S.C. § 441e ............................................................................... 1, 14

2 U.S.C. § 441f ................................................................................... 16

*8 U.S.C. § 1101 ......................................................................... 7, 8, 17

8 U.S.C. § 1157 .................................................................................... 7

8 U.S.C. § 1158 .................................................................................... 7

8 U.S.C. § 1159 .................................................................................... 8

8 U.S.C. § 1203 .................................................................................... 9

8 U.S.C. § 1227 .................................................................................... 9

26 U.S.C. § 7701 ................................................................................. 11

Chinese Exclusion Act of 1882, 22 Stat. 58 ......................................... 5

Chinese Exclusion Act of 1902, 32 Stat. 176 ....................................... 5

Emergency Quota Act of 1921, 42 Stat. 5 ................................................................5

Immigration Act of 1875, 18 Stat. 477 ...................................................................3

Immigration Act of 1891, 26 Stat. 1084 .................................................................3

Immigration Act of 1903, 32 Stat. 1213 ..........................................................3, 4, 5

Immigration Act of 1907, 34 Stat. 898 ...................................................................5

Immigration Act of 1917, 39 Stat. 874 .............................................................3, 4, 5

Immigration Act of 1924, 43 Stat. 153 ...................................................................6

Immigration and Nationality Act of 1952, 66 Stat. 163 ..........................................6

Naturalization Act of 1795, 1 Stat. 414 ..................................................................3

Naturalization Act of 1798, 1 Stat. 566 ..................................................................3

## OTHER AUTHORITIES

8 C.F.R. § 204.2 ......................................................................................................9

8 C.F.R. § 208.14 ....................................................................................................7

8 C.F.R. § 209.1 ......................................................................................................7

8 C.F.R. § 209.2 ......................................................................................................7

8 C.F.R. § 214.1 ......................................................................................................7

*8 C.F.R. § 214.2 .................................................................................8, 9, 18, 19

8 C.F.R. § 214.6 ................................................................................................9, 19

8 C.F.R. § 214.15 ....................................................................................................8

8 C.F.R. § 216.6 ......................................................................................................9

8 C.F.R. § 299.1 ....................................................................................................10

Black's Law Dictionary (8th ed. 2004) .................................................................10

Black's Law Dictionary (4th ed. 1957) .................................................................10

H.R. Rep. No. 54-1597 (1896).....................................................................................5

H.R. Rep. No. 64-1291 (1917).....................................................................................5

Presidential Determination No. 2007-1,
    71 Fed. Reg. 64,435 (Oct. 11, 2006) ....................................................17

Presidential Determination No. 2008-1,
    72 Fed. Reg. 58,991 (Oct. 2, 2007) ....................................................17

Presidential Determination No. 2008-29,
    73 Fed. Reg. 58,865 (Sept. 30, 2008) ...................................................17

Randall Monger and Macreadie Barr, Annual Flow Report:
    Nonimmigrant Admissions to the United States: 2009 ..........................18, 19, 20

Veto Message of President Grover Cleveland, Mar. 2, 1897 ....................................5

## INTRODUCTION
## AND STATEMENT OF INTEREST

This brief is filed on behalf of the Illinois Coalition for Immigrant and Refugee Rights (ICIRR), a coalition of 130 community neighborhood advocacy organizations operating across the state of Illinois.  ICIRR works to promote the rights of refugees and immigrants to full and equal participation in the civil, cultural, social, and political life of our diverse society.  The Alien Gag Law, 2 U.S.C. § 441e, prohibits all foreign nationals except for those designated "permanent residents" from making any contribution or expenditure in connection with local, state, or national elections.  This sweeping prohibition not only imposes an impermissible restriction on the First Amendment rights of many of the individuals ICIRR aims to serve, but by its very existence lends credence to the erroneous but prevalent view that foreign nationals living within our borders are not entitled to the protections of the Constitution.  ICIRR therefore has a strong interest in Plaintiffs' constitutional challenge to the Alien Gag Law.

This brief is offered in support of Plaintiffs' Motion for Summary Judgment to provide ICIRR's views on the irrationality of drawing an artificial line between "permanent" residents and other foreign nationals admitted to the United States, whether as a means of establishing the scope of the First Amendment or of narrowly tailoring a speech restriction.  All foreign nationals residing in the United States are entitled to freedom of speech under the First Amendment, and that right

cannot be taken away based on their mere identity as "foreign" speakers. Accordingly, ICIRR urges this Court to grant Plaintiffs' Motion for Summary Judgment.[1]

## ARGUMENT

### I.     The First Amendment Applies To All Persons Residing In The United States.

The Supreme Court has repeatedly confirmed that the First Amendment protects all "aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (same); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring in part and concurring in the judgment) (describing this principle as "well settled").   Those First Amendment protections may not be cut off by artificial legislative distinctions between "permanent" and "nonpermanent" residents.  Any constitutional line drawn upon that basis would find no support in history, fact, or Supreme Court precedent, all of which dictate that the First Amendment protects every foreign national living in the United States.

---

[1] This brief was not written in whole or in part by counsel for any party, and no person or entity other than *amicus*, its members, and its counsel has made a monetary contribution to the preparation and submission of this brief.

## A.    "Permanent Resident" is a Statutory Classification, Not a Constitutional One.

The distinction between "permanent" and other residents of the United States is of relatively recent pedigree.  It is a creature of federal statutory, not constitutional, law.  For nearly a century after the adoption of the Constitution, Congress did very little to regulate the admission of aliens to this country. Although Congress passed laws requiring persons wishing to be *naturalized* as citizens to declare their intention to do so, the Act did not require any sort of declaration as a condition of *admission*.  *See, e.g.*, Naturalization Act of 1795, ch. 20, 1 Stat. 414, § 1; Naturalization Act of 1798, ch. 54, 1 Stat. 566, 567, § 1.[2]  Even when Congress did begin to focus its attention on regulating the admission of foreign nationals in the late 19th century, it did so by defining classes of "excludable" aliens, not by classifying or restricting the rights of those who *were* deemed admissible.  *See, e.g.*, Immigration Act of 1875, ch. 141, 18 Stat. 477, § 3 (excluding criminals and prostitutes); Immigration Act of 1891, ch. 551, 26 Stat. 1084, § 1 (excluding persons likely to become public charges, persons with contagious diseases, and polygamists); Immigration Act of 1903, ch. 1012, 32 Stat. 1213, 1214, § 2 (excluding the ill and disabled, persons unable to support

---

[2] More than a century later, these provisions developed into a requirement that incoming foreigners declare whether they were planning to stay permanently and become citizens. *See* Immigration Act of 1917, ch. 29, 39 Stat. 874, 886.  But Congress attached no legal consequences to this declaration and does not appear to have made any attempt to prevent a newcomer from changing his or her mind later.

3

themselves, beggars, polygamists, and others); *id.*, 32 Stat. at 1221–22, §§ 38–39 (excluding anarchists and revolutionaries); Immigration Act of 1917, 39 Stat. at 875–76, § 3 (excluding alcoholics, illiterates, and persons from a large region of Asia).

Unsurprisingly, the case law developed along the same trajectory.  As more challenges began to arise regarding the scope of Congress's authority to impose restrictions on immigration and the rights of immigrants, the Supreme Court, like Congress, made no attempt to draw a constitutional (or any other) line based on the countless reasons that might have brought a foreign national to the United States or the intended duration of a foreign national's stay.  Quite the contrary, the Court plainly recognized that "aliens residing in the United States *for a shorter or longer time*, are entitled, so long as they are permitted by the government of the United States to remain in the country, to the safeguards of the Constitution."  *Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893); *see also United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (recognizing that aliens *outside* the country cannot claim First Amendment protections).[3]

---

[3] The Court later recognized that lawfully admitted aliens are entitled to constitutional protections with respect to deportation, including a constitutional right not to be deported for engaging in activities protected by the First Amendment.  *See Harisiades v. Shaughnessy*, 342 U.S. 580, 592 (1952) (deeming cognizable a First Amendment challenge to deportation based on membership in Communist Party but rejecting challenge on grounds that such membership was not protected by the First Amendment).

4

Although the turn of the 19th Century was witness to a variety of failed attempts to impose limitations based on the duration of an alien's stay,[4] distinctions based on permanent versus nonpermanent residency (more aptly, "immigrant" versus "nonimmigrant" status) did not develop in earnest until the advent of the quota system.[5]  It was only after Congress decided in the 1920s to start imposing restrictions on the number of aliens it would accept from certain countries that such distinctions became necessary.  *See* Emergency Quota Act of 1921, ch. 8, 42 Stat. 5 (establishing quota system).  In order to determine which persons should count

---

[4] For example, various versions of immigration legislation would have excluded all aliens who did not intend to stay in the United States permanently.  *See, e.g.*, H.R. Rep. No. 54-1597, at 1 (1896)  (recommending legislation aimed at preventing large numbers of aliens from "com[ing] to the United States with no intention of making this country their permanent abode").  One such bill was vetoed in 1897 by President Grover Cleveland, who in his veto message deemed the restriction "illiberal, narrow, and un-American."  Veto Message of President Grover Cleveland, Mar. 2, 1897 (discussing H.R. 7864, 54th Cong. § 4 (1897)), *available at* www.presidency.ucsb.edu/ws.  When similar legislation was recommended decades later, a House Report criticized it as "of apparently but slight practical value," noting that "its enforcement would necessitate the accurate ascertainment of the intention of the persons thereby affected."  H.R. Rep. No. 64-1291, at 3 (1917).

[5] Various minor exceptions to exclusion were made for temporary visitors in the late 19th and early 20th centuries.  *See, e.g.*, Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, 59, § 3 (permitting excludable Chinese laborers to come ashore temporarily if their ship was bound for a foreign port but forced to land in the United States by bad weather or other distress); Chinese Exclusion Act of 1902, ch. 641, 32 Stat. 176, 177, § 3 (temporary admission for workers in exhibitions or concessions); Immigration Act of 1903, 32 Stat. at 1218, § 19 (suspension of deportation for witnesses cooperating in prosecutions of violations of the immigration laws); Immigration Act of 1907, ch. 1134, 34 Stat. 898, 898–99, § 2 (admission for those in immediate and continuous transit through the United States); Immigration Act of 1917, 39 Stat. at 876–77, § 3 (permitting otherwise-barred Asian "travelers for curiosity and pleasure" or persons in continuous transit).

toward the quota, Congress began to establish classifications based on whether a foreign national would be staying in the United States (in which case that person would be considered an "immigrant" for quota purposes), or was more appropriately considered to be here temporarily or passing through (in which case the person would not count toward the quota). Thus, the Immigration Act of 1924 excluded from "immigrant" status persons coming to this country as government officials, tourists or business visitors; aliens in continuous transit through the country; and seamen and treaty traders. Immigration Act of 1924, ch. 190, 43 Stat. 153, 154–55, § 3.

As the Supreme Court recognized, in establishing this system Congress did not condition "immigrant" status on "permanent" residency, but rather excluded from "immigrant" status only the aforementioned specific and limited categories of short-term visitors. *See Karnuth v. United States* 279 U.S. 231, 242–43 (1929) ("The term ['immigrant' in the 1924 Act] thus includes every alien coming to this country either to reside permanently or for temporary purposes, unless he can bring himself within one of the [statute's nonimmigrant] exceptions."). Thus, although the term "lawfully admitted for permanent residence" developed as a means of referring to those admitted under "immigrant" status, *see United States ex rel. Stapf v. Corsi*, 287 U.S. 129, 132–33 (1932); *Werblow v. United States*, 134 F.2d 791, 792 (2d Cir. 1943); Immigration and Nationality Act of 1952, ch. 477, 66

6

Stat. 163, 169, § 101(a)(20), that term plainly included persons who had not designated the United States their indefinite permanent residence.  Accordingly, even within the past century, the terms "permanent" and "nonpermanent" resident have not had a statutorily fixed meaning.

### B.    Foreign Nationals Who Are "Nonpermanent" Residents By Designation Are Often Permanent Residents in Fact.

The "nonimmigrant" classifications created in the 1920s have become increasingly complex over time, producing scores of categories of persons considered "nonimmigrants" for quota-type purposes.  *See* 8 U.S.C. § 1101(a)(15); 8 C.F.R. § 214.1(a).  Yet those classifications often bear little if any relationship to how permanently a foreign national intends to reside within the United States, or how willing Congress may be to authorize that person to do so.  In reality, admission under many of the current "nonimmigrant" statuses is "nonpermanent" in name only, and effectively allows foreign nationals to remain in this country on a permanent or semi-permanent basis.

For example, persons admitted to the country as "refugees" or who are granted asylum after their arrival are not designated "permanent residents" (or "immigrants") and have no guarantee of obtaining that status.  *See* 8 U.S.C. §§ 1157(a), 1158(c)(2); 8 C.F.R. §§  209.1(a) & (b), 209.2.  Yet both groups may apply for permanent resident status after having lived here for one year.  *See* 8 C.F.R. § 209.  Moreover, those who obtain asylum are typically authorized to

7

remain in the United States indefinitely, *see* 8 C.F.R. § 208.14(e), and refugees also may remain in this country indefinitely while their applications for permanent residency are pending, *see Romanishyn v. Att'y Gen.*, 455 F.3d 175, 182 (3d Cir. 2006). And if a refugee is granted permanent residence, the grant is retroactive to the date of his or her arrival. 8 U.S.C. § 1159(a)(2). Similarly, while foreign national spouses, fiancé(e)s, and children of citizens or lawful permanent residents are not automatically granted "permanent resident" status, they are by and large authorized to reside and work in this country indefinitely until an immigrant visa becomes available. *See* 8 U.S.C. § 1101(a)(15)(K), (V); 8 C.F.R. §§ 214.2(k)(8), (10)(i), 214.15(g). As is clear, Congress's classification of these lawful residents as "nonpermanent" or "nonimmigrants" reflects little more than a statutory and regulatory gloss on the reality that there are not enough immigrant visas available for all the foreign nationals whom Congress has effectively authorized to live here permanently.

Other immigration categories reflect the same intent to ultimately permit nonimmigrants to live in the United States on a permanent basis. For example, regulations permit a foreign national to have a "dual intent" — on the one hand, entering the country as a nonimmigrant, but on the other hand applying for permanent residence while residing here in that "temporary" status. *See* 8 C.F.R. § 214.2(e)(5), (h)(16)(i), (l)(16), (o)(13), (p)(15), and (r)(15). These individuals

(and their families) are authorized to live and work in the United States, often for years at a time with indefinite renewals, and may — with the government's blessing — attempt to become permanent residents while they do so. *See, e.g.*, 8 C.F.R. §§ 214.2(e)(19)(i)–(ii), (20)(iii), 214.6(h)(iv), 216.6(e).   As a practical matter, many of these "nonpermanent" foreign nationals reside here every bit as permanently as those given that designation by Congress, and many will ultimately make a seamless transition from one regulatory status to the other.

Other provisions authorize foreign nationals to work in the United States for periods as long as five to seven years at a time, and authorize such persons to reapply for another five-to-seven year stay so long as they leave the United States for one year in between each stay.   *See, e.g.*, 8 C.F.R. § 214.2(h)(13)(iii)(A), (l)(12)(i), (r)(1), (r)(5)–(6).   These provisions similarly contemplate that foreign nationals may establish an essentially permanent home in this country by means of an indefinite series of nominally "temporary" stays, interrupted by relatively brief trips to their previous home country.   And almost all nonimmigrants can apply for permanent resident status if (as often happens during lengthy stays) they end up marrying a U.S. citizen or working for an employer who petitions for such on their behalf. *See, e.g.*, 8 U.S.C. § 1203(b); 8 C.F.R. § 204.2(a).

Conversely, foreign nationals with "immigrant" or "permanent resident" status are not necessarily any more "permanent" of residents — such individuals

can and sometimes do forfeit, relinquish, or abandon this status.  *See, e.g.*, 8 U.S.C. § 1227(a)(2) (providing for deportation of foreign nationals, including permanent residents, who commit certain crimes); 8 C.F.R. § 299.1 (providing form for voluntary abandonment of permanent residence); *Katebi v. Ashcroft*, 396 F.3d 463, 466–67 (1st Cir. 2005) (immigrant who travels abroad without intention to return to United States "as soon as practicable" abandons permanent residence).  As all of these various classifications and circumstances illustrate, the statutory distinction between "permanent" and "nonpermanent" residents is in many respects entirely out of touch with both the realities of immigration and the constitutional notion of residing in the United States.

### C.    Limiting the Reach of the First Amendment to the Statutorily Defined Category of "Permanent Residents" Would Be Inconsistent With Supreme Court Precedent.

Traditionally, the legal concept of "residence" in the United States has not required any showing that an individual has formally disavowed any intent to leave, or has divested him or herself of all sense of home elsewhere.  Residence is, instead, a simple question of where a person primarily lives at a given time in his or her life.  *See* Black's Law Dictionary 1335 (8th ed. 2004) (defining "residence" as "[t]he act or fact of living in a given place for some time"); *see also* Black's Law Dictionary 1473 (4th ed. 1957) (defining "residence" as "[a] factual place of abode" or "[l]iving in a particular locality," and "reside" as "[l]ive, dwell, abide,

10

sojourn, stay, remain, lodge"). For many "nonpermanent" foreign nationals, that place is unquestionably the United States. Indeed, the government itself has recognized as much when it suits the government's purposes. *See, e.g.*, 26 U.S.C. § 7701(b)(3)(A) (deeming an alien present in the United States for half the days in a tax year a "resident" for income tax purposes).

There is no reason to think the Supreme Court has not recognized the same when it has repeatedly affirmed that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges*, 326 U.S. at 148; *Colding*, 344 U.S. at 596 n.5; *Reno*, 525 U.S. at 497 (Ginsburg, J., concurring in part and concurring in the judgment). During the same period when *Bridges* and *Colding* were decided, the Court plainly recognized that "residence" is not the same thing as "permanent residence." *See Savorgnan v. United States*, 338 U.S. 491, 504–05 & n.24 (1950) (contrasting "residence" with "permanent residence" in the context of a denaturalization statute). Had the Court intended the application of the First Amendment to depend upon the statutorily defined and ever-shifting category of "permanent residents," rather than the much broader traditional concept of simply living within our borders, it would have said so expressly.

Moreover, recent Supreme Court precedent suggests (correctly, in ICIRR's view) that even foreign nationals who are not residents may, in some instances, be entitled to First Amendment rights. Exploring the reach of constitutional

11

amendments (including the First Amendment) that broadly apply to "the people," the Court suggested that "'the people' . . . refers to a class of persons who are part of [our] national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).  Although the Court tied that description to lawful and "voluntary" presence, *see id.* at 265, 272, it gave no indication that a foreign national must reside — permanently or otherwise — in the United States to be considered one of "the people" entitled to constitutional protections.  Had the Court thought as much, *Verdugo-Urquidez* would have been a much shorter opinion:  it was uncontested that Verdugo-Urquidez himself was a resident of Mexico.  *Id.* at 262.

Whatever the precise boundaries of the line recognized in *Verdugo-Urquidez*, there is no question that foreign nationals who are lawfully admitted to this country and take up residence here, even if on a nonpermanent basis, will voluntarily "develop[] sufficient connection with this country to be considered part of th[e national] community."  *Id.* at 265.  Such individuals will become just as much a part of their community as American citizens or "permanent" residents, buying or renting houses, obtaining jobs, paying taxes, making friends, sending their children to school — in short, doing all of the ordinary things a member of our national community does.  Indeed, courts interpreting *Verdugo-Urquidez* have

concluded that foreign nationals may satisfy its standard based on much less significant ties than a nonpermanent resident will develop.  *See, e.g.*, *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (foreign national's authorized once-a-month visits and "acquiescence in the U.S. system of immigration constitute her voluntary acceptance of societal obligations, rising to the level of 'substantial connections'").  Without a doubt, therefore, the statutorily defined category of "permanent" residency is far too restrictive to encompass the many ways in which foreign nationals voluntarily become part of our national community.

*       *       *

In sum, the categorization of aliens as "immigrants" or "nonimmigrants," or "permanent" versus "nonpermanent" residents, is not part of our historical or constitutional tradition and does not adequately reflect the realities of immigration. These categories are instead creatures of statute, designed to ease the administration of the complex web of immigration laws that has developed over the past century.  These ever-shifting and in large part arbitrary distinctions are not an appropriate means by which to cabin the scope of the First Amendment.  *See NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[The legislature] cannot foreclose the exercise of constitutional rights by mere labels.").  The First Amendment instead applies to all "aliens residing in this country," *Bridges*, 326 U.S. at 148,

13

and any restrictions on the speech of those persons must therefore satisfy strict scrutiny.

## II.     First Amendment Classifications Based On "Permanent" Or "Nonpermanent" Resident Status Do Not Satisfy Strict Scrutiny.

Although one might not realize it from reading the government's motion to dismiss, the Alien Gag Law imposes a First Amendment restriction — indeed, it imposes a flat *ban* on political speech — and therefore must satisfy strict scrutiny to be deemed constitutional. *See, e.g.*, *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) ("Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." (internal quotation marks omitted)); *Buckley v. Valeo*, 424 U.S. 1, 14, 23 (1976) (per curiam) (restrictions on campaign contributions and expenditures "operate in an area of the most fundamental First Amendment activities" that are "subject to the closest scrutiny"). The Supreme Court recently recognized as much when referencing 2 U.S.C. § 441e itself. *See Citizens United*, 130 S. Ct. at 911 ("We need not reach the question whether the Government *has a compelling interest* in preventing foreign individuals or associations from influencing our Nation's political process." (emphasis added)).[6]  For that reason, the government bears the burden of showing

---

[6] As is implicit in the Court's choice of words in *Citizens United*, the constitutionality of the Alien Gag Law as applied to foreign corporations presents a different question than as

14

that its blanket prohibition on campaign contributions and expenditures by any foreign national other than a permanent resident is narrowly tailored to further a compelling government interest. *Id.* at 898. The government cannot come close to satisfying that standard.

As an initial matter, the notion that their designation as "permanent" or "nonpermanent" residents makes foreign nationals more or less likely to be unduly and harmfully influenced by foreign governments or other foreigners is itself inherently suspect. As illustrated in Part I, *supra*, the line between those two designations is not nearly as bright in reality as in the byzantine regulations governing immigration law. Just as very little prevents many "nonpermanent" residents from effectively making the United States their home, nothing prevents "permanent" residents from maintaining significant ties to their home countries. "Permanent" residents typically remain just as much citizens of foreign nations as "nonpermanent" residents, and they can and do give up their United States residence and return to their countries of origin. *See supra* at 10. The government's failure to explain why "permanent" residents are outside the scope of its purportedly compelling interest in combating a perceived threat of undue

---

applied to foreign individuals. As this case only concerns the latter, there is no need for this Court to consider whether the government might have a more compelling interest in preventing the influence of foreign corporations on American elections — or, for that matter, the circumstances under which a foreign corporation might fall within the scope of the First Amendment.

15

foreign influence is reason enough to question the sincerity of the government's professed motivation. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." (citation and internal quotation marks omitted)).

Even taking at face value the government's assertion that it has a compelling interest in preventing the undue influence of foreign governments or enemies on American elections, the Alien Gag Law is not remotely narrowly tailored to achieve that goal. At any given time, hundreds of thousands of foreign nationals are lawfully residing in the United States under "nonimmigrant" classifications. Even a cursory review of the circumstances under which those various individuals were admitted reveals that there is no logic to Congress's assumption that they are all likely to use their First Amendment rights in a manner that is threatening to American elections. For that reason, Congress's decision to prohibit *all* nonpermanent residents from making *any* campaign contributions or expenditures in *any* election is a dramatically overbroad means of responding to whatever compelling interest the government might have.[7]

---

[7] That is particularly true given that foreign nationals, just like U.S. citizens, are already prohibited from making contributions on behalf of others (including foreign governments and foreigners living abroad), *see* 2 U.S.C. § 441f, and covered by existing contribution

16

Perhaps the starkest illustration of the overbreadth of the Alien Gag Law is its application to refugees and asylees.  From 2007 through 2009, the President authorized the admission of 230,000 refugees to the United States,[8] and more than 30,000 persons were granted asylum.[9]  To qualify as refugees, all of these individuals had to show that they were "unable or unwilling to return to, and . . . unable or unwilling to avail [themselves] of the protection of, [their home] countr[ies] because of persecution or a well founded fear of persecution."  8 U.S.C. § 1101(a)(42).  The notion that those who come to the United States for the express purpose of escaping persecution by their own government are likely to turn around and support the interests of their persecutor in American elections is nothing short of absurd.  Even if it could be assumed that refugees may seek to influence American elections in ways that will help their fellow countrymen escape the same persecution, speech aimed at encouraging the United States to help end persecution by foreign governments is hardly the kind of "foreign influence" the government might have a compelling interest in suppressing.

---

limits, *id.* § 441a(a).  Moreover, the government's unprecedented inclusion of state and local elections in this federal speech restriction raises a constitutional issue in and of itself.

[8] Presidential Determination No. 2008-29, 73 Fed. Reg. 58,865 (Sept. 30, 2008); Presidential Determination No. 2008-1, 72 Fed. Reg. 58,991 (Oct. 2, 2007); Presidential Determination No. 2007-1, 71 Fed. Reg. 64,435 (Oct. 11, 2006).

[9] U.S. Dep't of Justice Exec. Office for Immigration Review, Office of Planning, Analysis & Technology, *Immigration Courts Asylum Statistics*, 2007–2009, *available at* http://www.justice.gov/eoir/efoia/foiafreq.htm (follow links for "FY2009," "FY2008," and "FY2007").

The government similarly has no compelling interest in prohibiting campaign-related contributions and expenditures by foreign nationals who plainly intend to become permanent residents.  Between 2007 and 2009, more than 175,000 people were admitted as spouses or children of American citizens or permanent residents. *See* Randall Monger and Macreadie Barr, Annual Flow Report: Nonimmigrant Admissions to the United States: 2009 (hereinafter "Flow Report"), p. 3 Table 1, *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/ni_fr_2009.pdf. As discussed, *see supra* at 8, these individuals are authorized and expected to ultimately obtain permanent residency, and are therefore undoubtedly far more interested in using contributions and expenditures to influence local, state, and national government in a way that will be beneficial to themselves and their families in their future lives in the United States.  Many more nonimmigrants are admitted through "dual intent" classifications that authorize them to seek permanent resident status while here if they so choose.  *See, e.g.*, 8 C.F.R. § 214.2(e)(5), (h)(16)(i), (l)(16), (o)(13), (p)(15), and (r)(15).  The government provides no explanation or evidence to support the assumption implicit in the Alien Gag Law that it has a compelling interest in suppressing all campaign-related contributions or expenditures by individuals who clearly intend to remain here permanently — individuals whom, by any measure, we should be *encouraging* to take an interest in elections that will substantially affect their lives.

Other nonimmigrant statuses permit foreign nationals to remain in the United States for years at a time under circumstances that provide no basis for suspicion of their intentions in seeking to exercise First Amendment rights.  For example, from 2007–2009, more than 250,000 foreign nationals from countries that are parties to NAFTA were admitted through multi-year and often infinitely renewable work statuses designated for nationals of these American allies.  *See* Flow Report at 4, Table 2.  These individuals are authorized to live here and work here, and to bring their families with them while they do so.  *See* 8 C.F.R. § 214.6.  Living side by side with American citizens, they buy houses, enroll their children in schools and extracurricular programs, and participate in neighborhood or community organizations.  The government identifies no reason to believe these people are at the same time likely to attempt — at the behest of our allies or their citizens, no less — to use their First Amendment rights to exert some sort of threatening influence over local, state, and national elections.

During that same three-year time frame, hundreds of thousands of athletes, entertainers, or foreign nationals with other "extraordinary abilities" have also been admitted to live here and share their gifts for years at a time.  *See* 8 C.F.R. § 214.2(o)(10), (p)(12); Flow Report at 4 Table 2.  And well over a million religious workers or others in specialty occupations have been admitted to live and work here for years at a time.  *See* 8 C.F.R. § 214.2(h)(13)(iii)(A), (r)(1), (5)–(6);

19

Flow Report at 4 Table 2.  All of these individuals, oftentimes with their families, come here to gain opportunities they do not have in their home countries.  While doing so, they establish not only a residence but also substantial ties to and interests in their local, state, and national communities.  The government's blanket assumption that these millions of diverse individuals cannot be trusted to exercise First Amendment rights without posing a threat to state, local, and national elections finds no basis in reality, let alone in any of the evidence that animated Congress's adoption of the Alien Gag Law.

In short, the Alien Gag Law is so remarkably overbroad as to confirm that Congress was not truly motivated by any legitimate compelling interest.  The law is instead nothing more than a bald-faced attempt to suppress the speech of a politically disfavored group.  *Citizens United* is answer enough to that.  As the Court explained, the First Amendment does not permit the government to "deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration."  *Citizens United*, 130 S. Ct. at 899.  Notwithstanding Congress's distrust of "corporate" influence on American elections, "the First Amendment does not allow political speech restrictions based on a speaker's corporate identity."  *Id.* at 903.  By the same measure, the First Amendment does not allow such restrictions based on a speaker's mere identity as "foreign."  Congress may not circumvent that prohibition by invoking arbitrary

20

immigration law classifications that are not part of our historical or constitutional traditions.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

/s/ Erin E. Murphy
Erin E. Murphy (D.C. Bar. No. 995953)
(motion for *pro hac vice* admission pending)
Nicholas J. Nelson
(motion for *pro hac vice* admission pending)
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

*Counsel for Amicus Curiae*
*Illinois Coalition for Immigrant and Refugee Rights*

February 18, 2011

# CERTIFICATE OF SERVICE

Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure and Local Rule 5.4(d), I hereby certify that I have this 18th day of February, 2011, served a copy of the foregoing documents electronically on the following counsel:

Warren Postman
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113
(202) 879-3913
wpostman@jonesday.com

David Brett Kolker
Federal Election Commission
999 E Street, NW
Washington, DC 20463-0002
(202) 694-1650
Email: dkolker@fec.gov

Jacob M. Roth
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113
(202) 879-7658
yroth@jonesday.com

Kevin Deeley
Federal Election Commission
999 E Street, NW
Washington, DC 20463-0002
(202) 694-1556
Email: kdeeley@fec.gov

Adav Noti
Federal Election Commission
999 E Street NW
Washington, DC 20463
(202) 694-1384
Email: anoti@fec.gov

Steve Nicholas Hajjar
Federal Election Commission
999 E Street, NW
Washington, DC 20463
(202) 694-1546
Email: shajjar@fec.gov

/s/ Erin E. Murphy

Erin E. Murphy (D.C. Bar. No. 995953)
(motion for *pro hac vice* admission pending)
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737