# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**Benjamin Bluman, et al.**

Plaintiffs,

v.

**Federal Election Commission,**

Defendant.

---

Civil Action No. 10-1766
RMU-BMK-RMC

(Three Judge Court)

REPLY MEMORANDUM

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Jacob M. Roth (D.C. Bar No. 995090)
Warren D. Postman  (D.C. Bar No. 995083)
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
yroth@jonesday.com
wpostman@jonesday.com

**Counsel for Plaintiffs**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.      The Commission's Attempts To Evade Heightened Scrutiny Are Meritless. ................... 3

    A.      Political Speech Is Not a Form of "Democratic Self-Government" and Therefore Cannot Be Limited to Citizens. .............................................. 5

    B.      The Commission's Equal Protection Cases Say Nothing To Justify Uniquely Low Scrutiny for Restrictions on Aliens' Political Speech. .................. 8

    C.      The Restrictions of the Alien Gag Law Are Subject to Heightened Scrutiny. ................................................................................................ 10

II.     The Commission's Attempts To Satisfy Heightened Scrutiny Are Meritless. ................ 12

    A.      The Commission Expressly Disclaims a Series of Potential Rationales for the Alien Gag Law. .......................................................................... 12

    B.      The Government's Assertedly Compelling Interest in Preventing "Foreign Influence" Is *Per Se* Illegitimate Under the First Amendment. .......................... 14

    C.      The Alien Gag Law's Blunderbuss Censorship Is Not Remotely Tailored to the Commission's Asserted Interest. ............................................. 17

III.    The Commission Continues To Argue from Consequences That Do Not Follow from Plaintiffs' Position. ................................................................................. 21

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ambach v. Norwick,*
  441 U.S. 68 (1979)............................................................................................9

*American-Arab Anti-Discrimination Committee v. Reno,*
  70 F.3d 1045 (9th Cir. 1995) ........................................................................3

*American-Arab Anti-Discrimination Committee v. Reno,*
  119 F.3d 1367 (9th Cir. 1997), *vacated by* 525 U.S. 471 (1999) ...............3

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002)........................................................................................7

*Bernal v. Fainter,*
  467 U.S. 216 (1984)......................................................................................10

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) (per curiam)..........................................................13, 14

*\*Buckley v. Valeo,*
  424 U.S. 1 (1976) (per curiam)............................................... *passim*

*Cabell v. Chavez-Salido,*
  454 U.S. 432 (1982)......................................................................................10

*Citizens Against Rent Control v. Berkeley,*
  454 U.S. 290 (1981)................................................................................11, 20

*\*Citizens United v. FEC,*
  130 S. Ct. 876 (2010)............................................................. *passim*

*Davis v. FEC,*
  554 U.S. 724 (2008)........................................................................................6

*Emily's List v. FEC,*
  581 F.3d 1 (D.C. Cir. 2009) .........................................................................11

*FCC v. Pacifica Found.,*
  438 U.S. 726 (1978)........................................................................................2

*FEC v. Beaumont,*
  539 U.S. 146 (2003)......................................................................................11

*FEC v. Wisc. Right to Life, Inc.,*
  551 U.S. 449 (2007) (plurality opinion) ................................................11, 17

*First Nat'l Bank of Boston v. Bellotti,*
   435 U.S. 765 (1978)..............................................................................15, 16, 20

*Florida Star v. BJF,*
   491 U.S. 524 (1989)..............................................................................18

*Humanitarian Law Project v. Reno,*
   205 F.3d 1130 (9th Cir. 2000) ............................................................3

*Johnson v. De Grandy,*
   512 U.S. 997 (1994)..............................................................................23

*Kwong Hai Chew v. Colding,*
   344 U.S. 590 (1953)..............................................................................10

*McConnell v. FEC,*
   540 U.S. 93 (2003)................................................................................8

*Moving Phones Partnership L.P. v. FCC,*
   998 F.2d 1051 (D.C. Cir. 1993) ...........................................................9

*N.Y. State Bd. of Elections v. Lopez Torres,*
   552 U.S. 196 (2008)..............................................................................15

*NAACP v. Button,*
   371 U.S. 415 (1963)..............................................................................18

*R.A.V. v. St. Paul,*
   505 U.S. 377 (1992)..............................................................................7

*Randall v. Sorrell,*
   548 U.S. 230 (2006) (plurality opinion) ..............................................23

*Red Lion Broad. Co. v. FCC,*
   395 U.S. 367 (1969)..............................................................................9

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
   525 U.S. 471 (1999)..............................................................................3, 11

*Reynolds v. Sims,*
   377 U.S. 533 (1964)..............................................................................5, 6

*Ruggiero v. FCC,*
   317 F.3d 239 (D.C. Cir. 2003) (en banc) ............................................9

*Tashjian v. Republican Party of Conn.,*
   479 U.S. 208 (1986)..............................................................................18

*Texas v. Johnson*,
    491 U.S. 397 (1989)......................................................................................23

*Thornhill v. Alabama*,
    310 U.S. 88 (1940).......................................................................................16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)......................................................................................23

*United States v. Barona*,
    56 F.3d 1087 (9th Cir. 1995) .......................................................................22

*United States v. Esparza-Mendoza*,
    265 F. Supp. 2d 1254 (D. Utah 2003)..........................................................22

*United States v. Guitterez*,
    983 F. Supp. 905 (N.D. Cal. 1998) ..............................................................22

*United States v. Stevens*,
    130 S. Ct. 1577 (2010) ...................................................................................7

*\*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) .............................................................................. *passim*

*United States v. Virginia*,
    518 U.S. 515 (1996).................................................................................12, 14

*Vannatta v. Keisling*,
    151 F.3d 1215 (9th Cir. 1998) .......................................................................7

*Whitney v. California*,
    274 U.S. 357 (1927)........................................................................................6

## CONSTITUTIONAL AUTHORITIES

U.S. Const. Amendment I ................................................................................ *passim*

U.S. Const. Amendment IV .....................................................................................22

U.S. Const. Amendment XIV ..............................................................................9, 17

## STATUTES

2 U.S.C. § 441e .......................................................................................... *passim*

2 U.S.C. § 441f .........................................................................................................13

**REGULATIONS**

11 C.F.R. § 100.29(b) ...........................................................................................................7

11 C.F.R. § 110.20(e).............................................................................................................7

**OTHER AUTHORITIES**

120 Cong. Rec. 8783 (Mar. 28, 1974) .............................................................................19

FEC Advisory Op. 1995-09 ..............................................................................................11

S. Rep. No. 105-167, *available at* http://www.fas.org/irp/congress/1998_rpt/sgo-sir/
    1-12.htm .......................................................................................................................19

S. Rep. No. 105-167, *available at* http://www.fas.org/irp/congress/1998_rpt/sgo-sir/
    4-7.htm .........................................................................................................................19

## **INTRODUCTION**

In their initial memorandum [Dkt. No. 19 ("SJ")], Plaintiffs explained that their case rests on two simple points of law.  First, all lawful residents of the United States, including aliens, are protected by the First Amendment.  (SJ 21-28)  Second, the First Amendment guarantees the right to express one's political views through contributions to candidates for elective office and independent expenditures to advocate for such candidates.  (SJ 29-31)  Consequently, the Alien Gag Law—to the extent that it prohibits lawful residents of the United States from so expressing their views—must satisfy heightened scrutiny, which it does not remotely do.  (SJ 31-46)

In its opposition [Dkt. No. 30 ("Opp.")], the Commission purports to accept the two legal premises underlying Plaintiffs' argument.  It concedes "that aliens in the United States have First Amendment rights."  (Opp. 22)  And it (somewhat grudgingly) admits that the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), held that the First Amendment requires limits on political contributions to satisfy "intermediate scrutiny" and restrictions on independent expenditures to meet the "strict scrutiny" test.  (Opp. 30, 32)  The inevitable legal consequence of those premises is that the Alien Gag Law, as applied to lawful aliens residing in the United States, is subject to heightened scrutiny.  But this the Commission stubbornly refuses to accept.

Instead, the Commission continues to urge application of a "rational basis" test—the lowest standard of constitutional scrutiny, one that applies to statutes that do not implicate *any* enumerated constitutional right.  (Opp. 18)  Sure, the First Amendment protects aliens' speech *generally*, the Commission concedes, but *political spending* is participation in "the democratic process of self-government" and so lacks constitutional protection.  (Opp. 12, 22)  This is a striking claim in light of the Supreme Court's campaign finance jurisprudence.  Because *Buckley* establishes that political spending stands on the same constitutional footing as other political speech, the Commission must be arguing that *any* speech by aliens about elections—whether in

an ad or on a soapbox—is participation in "self-government" and lacks ordinary First Amendment protection.  (Alternatively, if the Commission's position is that "soapbox" speech is more protected than paid-for speech, it is asking this Court to overrule *Buckley*.)

The Commission's position on speech about "self-government" ignores the basic distinction between *governing* and *speech*; runs counter to both logic and precedent; and is incompatible with any plausible conception of the First Amendment.  It is therefore not surprising that the only authority the Commission can muster is a set of Equal Protection cases holding that aliens have no right to hold public office or certain public employment, but saying nothing about restrictions on *speech*.  Repetition of the phrase "democratic self-government," a term drawn from those cases, is no basis for doing away with Plaintiffs' core speech rights.

In its alternative argument that the Alien Gag Law satisfies heightened scrutiny, the Commission's error is no less pernicious and no more defensible.  The Commission cites, as the "compelling" interest justifying the restrictions, the need to "protect[] the American democratic system from foreign influence."  (Opp. 32)  Although it refuses to unpack that loaded term, the intent is plain:  The Government may restrict the constitutionally protected political speech of resident aliens because their views are less important, less meaningful, and less trustworthy than the speech of citizens, and might (gasp!) even convince the electorate to support a particular candidate.  Put that way, the argument is clear—and clearly irreconcilable with the First Amendment, "[f]or it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas."  *FCC v. Pacifica Found.*, 438 U.S. 726, 745-46 (1978) (opinion of Stevens, J.).  The Commission is claiming the power not just to take *sides* in that marketplace, but to keep disfavored groups *out*.  This is not a justification for the Alien Gag Law; it is a powerful demonstration of why it is unconstitutional.

Finally, the Commission attempts to bolster its "self-government" and "foreign influence" arguments by pointing to consequences that it claims would follow from recognizing Plaintiffs' well-established rights to political speech.  The Commission, however, is willfully over-reading Plaintiffs' position.  Recognizing the right to political speech of natural-person residents of the United States would in no way require the extension of those rights to foreign corporations or illegal aliens (Opp. 39-40), who are not part of "the people" as defined by *United States v. Verdugo-Urquidez,* 494 U.S. 259, 271-72 (1990).  Obfuscation cannot conceal the only relevant questions in this case:  Does the First Amendment protect the right of resident aliens to engage in political speech?  Does the right to political speech include the right to political spending?  And can the Government deny resident aliens this right in order to prevent "foreign" influence on the electorate?  The answers are indisputable.

## ARGUMENT

### I.    The Commission's Attempts To Evade Heightened Scrutiny Are Meritless.

Perhaps realizing that the Alien Gag Law cannot hope to survive any form of heightened scrutiny, the Commission devotes much of its brief to arguing for a "rational basis" standard of scrutiny.  (Opp. 10-30)  But it cannot offer any coherent rationale for invoking this relaxed standard.  The Commission admits that resident aliens are protected by the First Amendment and thus generally enjoy the right to freedom of speech.  (Opp. 18 n.3, 22)[1]  And it also concedes that restrictions on political spending are generally subject to heightened scrutiny under the First Amendment.  (Opp. 30, 32)  Why then should the First Amendment activity of aliens protected by the First Amendment be treated any differently?

---

[1] The Commission, oddly, still attempts to distinguish the cases establishing that proposition (Opp. 22-24 & nn.4-5), but seeing as it agrees with the legal bottom-line, there is no need to further debate the point.  The Commission is wrong, however, to fault Plaintiffs for citing *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995) ("*AADC I*").  (Opp. 23)  The Supreme Court vacated only a *subsequent* opinion of the Ninth Circuit in that case, 119 F.3d 1367 (9th Cir. 1997), *vacated*, 525 U.S. 471, 476 (1999) ("It is the judgment and opinion in that appeal which is before us here."), and the Ninth Circuit has continued to treat its initial *AADC I* decision as good law, *e.g.*, *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133-34 (9th Cir. 2000).

According to the Commission, political spending is a form of "democratic self-government," which can be denied to aliens without any meaningful constitutional scrutiny. Taking *Buckley* seriously, this is an extreme claim.  In that case, the Government argued that spending limits "should be viewed as regulating conduct, not speech" and thus subject to reduced scrutiny.  424 U.S. at 16.  The Court decisively rejected that approach:  "[T]his Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment."  *Id.*  That is, the fact that it takes money to engage in speech does not change its First Amendment nature or the protections it deserves.[2]

Therefore, unless the Commission is asking this Court to overturn *Buckley*, its position must be that the Government may ban (subject only to rational basis review) *any* election-related speech by aliens.  Yet the Commission provides virtually no authority to support this extreme claim, offering only a set of Equal Protection cases that use the phrase "democratic self-government" in holding that aliens have no right to hold public office or certain government jobs.  Plaintiffs do not dispute that aliens have no right to *participate in government* by voting, serving as public officials, or holding certain public employment—but the Commission never explains why quintessential First Amendment activity falls into the same category.  Its arguments from assertion do not withstand scrutiny.  Political speech is not by any stretch an act of "governing," and the Commission's attempt to conflate the two is inconsistent with both legal precedent and legal principle.

---

[2] The Commission's apparent unwillingness to accept *Buckley* is evident elsewhere in its opposition, as well.  For example, the Commission repeatedly observes that resident aliens remain permitted to speak out about issues, so long as they do not advocate for candidates.  (Opp. 20, 29 n.6, 45-47)  The very same was true of the restrictions in *Buckley*, but the Court there explained that "[a]dvocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation."  424 U.S. at 48.  And the Commission devotes an entire section to the alleged content-neutrality of § 441e (Opp. 28-30), but the Alien Gag Law targets *election-related* speech exactly as the laws at issue in *Buckley* did, so this is no distinction either.

**A.    Political Speech Is Not a Form of "Democratic Self-Government" and Therefore Cannot Be Limited to Citizens.**

Although it uses the phrase "self-government" or "self-governance" 27 times in its opposition, the Commission offers no definition of this concept.  Nor does it cite a single case that applies it to uphold a limitation on First Amendment activity, as opposed to limitations on voting or holding government office.  *See* Part I.B, *infra*.

Conceptually, however, the distinction between political speech and "self-government" is plain.  When an individual engages in election-related speech, the propagation of his views has no direct legal effect.  Rather, the only way that political speech actually affects government is indirectly through its *power to persuade*.  Ultimately, it is still only *voters* and *government officials* who participate in democratic self-government and exercise sovereign functions.  One who engages in election advocacy is no more a participant in self-government than Adam Smith or Karl Marx would be if those authors' works convinced a voter to support a certain candidate or persuaded a politician to adopt a certain policy.  By contrast, an individual's vote has direct and independent legal force in determining who forms government; his signature on a referendum petition has direct and independent legal force in determining which policy matters are placed before the electorate; and his use of the powers of his government office (if he holds one) has direct and independent legal force in creating and executing the law.  These sorts of legally constitutive acts cannot be compared to mere speech.

There is also a compelling logical reason to distinguish the two.  Political power, whether in the form of voting or holding government office, is zero-sum.  An alien's vote necessarily dilutes the governing power of citizens, reducing their relative authority.  *Cf. Reynolds v. Sims*, 377 U.S. 533, 554-56 (1964).  Similarly, if an alien holds public office or is hired as a civil servant, then he is necessarily exercising government authority that would otherwise have been

vested in a citizen.   By contrast, there is no analogous concern that one person's speech—
*including in the form of political spending*—will dilute another's; to the contrary, "restrict[ing]
the speech of some elements of our society in order to enhance the relative voice of others is
wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 48-49.   In the realm of speech, the
governing constitutional principle is "more speech, not enforced silence." *Whitney v. California*,
274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

Moreover, if the Commission's classification of election-related speech as "self-
government" were valid, Congress and the States would have far greater latitude to regulate
political speech than the law permits—along at least three different axes.

First, if political spending really constituted participation in "self-government," Congress
would be permitted to "level the playing field" among citizens, just as it may—indeed, must—
with respect to the right to vote, by drawing voting districts to prevent "dilution" of some
citizens' political power.  *See Reynolds*, 377 U.S. at 554-56, 567-69.   Yet the Supreme Court has
long rejected the argument that the Government may use spending limits to "equaliz[e] the
relative ability of individuals and groups to influence the outcome of elections."   *Buckley*, 424
U.S. at 48.   It has done so because political spending is *speech*, and there would be "ominous
implications" to allowing "Congress to arrogate the voters' authority to evaluate the strengths of
candidates competing for office."  *Davis v. FEC*, 554 U.S. 724, 742 (2008).

Second, if Congress could prohibit aliens from *election-related* speech because it is a
form of participation in self-government, Congress could equally ban aliens from engaging in
*policy advocacy*.   The Commission repeatedly tells us that so-called "issue advocacy" remains
open to aliens (Opp. 20, 45), but (under its theory) this would be so only as a matter of grace.[3]

---

[3] In fact, Plaintiffs are not really free to engage in issue advocacy, even as a matter of statutory grace; under
the Commission's own definition of an "electioneering communication," issue advocacy that merely mentions a

After all, the enactment of laws by a democratic legislature is the ultimate expression of "democratic self-government."   Likewise, while the Commission states that Plaintiffs "can attempt to contact elected representatives" (Opp. 20), it does not explain the counterintuitive conclusion that non-citizens may be prohibited from lobbying *voters* but not from lobbying *legislators*.   Thus, the Commission has offered no principle to limit its theory to election-related speech; rather, its position would necessarily allow the censorship of *all* political speech by aliens.   That would turn the First Amendment on its head, applying rational basis scrutiny to restrictions on political advocacy (the constitutional core), while subjecting to strict scrutiny laws that restrict aliens' freedom to create animal fetish videos, *United States v. Stevens*, 130 S. Ct. 1577 (2010), engage in hate speech, *R.A.V. v. St. Paul*, 505 U.S. 377 (1992), or distribute virtual child pornography, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).

Third, on the Commission's (unexplained) assumption that political speech is a form of "self-government," numerous other groups excluded from the democratic process would equally lack political speech rights.   But, as illustrated by Plaintiffs in their opening brief, that is not so. For example, residents of State A are foreclosed from participating in the "self-government" of State B—for the very same reason that the Commission says resident aliens cannot so participate, *i.e.*, "because they lack sufficient ties" to the jurisdiction (Opp. 50)—yet the Ninth Circuit correctly held that a law forbidding cross-jurisdictional *spending* was subject to (and failed) heightened scrutiny under the First Amendment.   *Vannatta v. Keisling*, 151 F.3d 1215, 1218 (9th Cir. 1998).   The Commission's brief does not even cite, let alone distinguish, that decision.   Minors, too, are lawfully excluded from "participating in self-government" through

---

(continued…)

candidate's name within 60 days of a general election or 30 days of a primary election could subject the alien advocate to criminal punishment under § 441e.  *See* 11 C.F.R. §§ 100.29(b)(3)(i); 110.20(e).

voting, holding office, serving on juries, etc.  The Commission says this is because they are "immature" (Opp. 50), and that is true.  The point, however, is that although their immaturity provides a basis for excluding them from *self-government*, the Supreme Court nonetheless held that they cannot be forbidden from engaging in political speech.  *McConnell v. FEC*, 540 U.S. 93, 231-32 (2003).  Similarly, domestic corporations cannot participate in "self-government," yet the Supreme Court *rejected* the argument that, consequently, they could be foreclosed from engaging in political speech through independent advocacy for candidates.  *Citizens United v. FEC*, 130 S. Ct. 876, 916 (2010).  The Commission's response to these examples of minors and corporations—that these "do not even involve aliens" (Opp. 50)—misses the point.  The illustrations show that many who (like aliens) can be excluded from direct participation in "self-government" are nonetheless constitutionally entitled to express their political views, including by advocating for candidates.  This refutes the Commission's central premise, that election-related speech is indistinguishable from "democratic participation" (Opp. 49).

> **B.      The Commission's Equal Protection Cases Say Nothing To Justify Uniquely Low Scrutiny for Restrictions on Aliens' Political Speech.**

Plaintiffs' opposition to the Commission's motion to dismiss analyzed the fourteen cases on which the Commission initially relied in arguing for a rational basis standard of scrutiny.  (SJ 50-52)  Plaintiffs showed that ten of these fourteen cases did not arise under the First Amendment at all; and the remaining four *refuted* the Commission's argument that a uniquely low standard governed First Amendment claims by resident aliens.  Now, the Commission has retreated, claiming only that *two* of its cases "involved First Amendment activity."  (Opp. 19)  But even this claim is demonstrably false: one of these cases affirmatively *rejected* the argument that the alien had engaged in First Amendment activity.  And the other involved a claim to government benefits, not free speech, and did not even *mention* the First Amendment.

In *Ambach v. Norwick*, 441 U.S. 68 (1979), the question was "whether a State, consistently with the *Equal Protection Clause* of the Fourteenth Amendment, may refuse to employ [aliens] as elementary and secondary school teachers." *Id.* at 69 (emphasis added).  The Commission identifies a footnote addressing a frivolous claim that the restriction of an alien's "freedom" to teach in public schools was "contrary to principles of diversity of thought and academic freedom embodied in the First Amendment." *Id.* at 79 n.10.  But the Court did not hold that the plaintiff's alienage justified a restriction on speech activity.  Rather, the Court *rejected* the argument that First Amendment activity was implicated at all, holding that "the opportunity to teach in the State's schools . . . is not a liberty that is accorded constitutional protection" by that Amendment. *Id.*

In *Moving Phones Partnership L.P. v. FCC*, 998 F.2d 1051 (D.C. Cir. 1993), the court first held that "the Commission reasonably interpreted the [Communications] Act" and that its "dismissal of appellants' [license] applications was reasonable." *Id.* at 1053.  The court also addressed a solitary constitutional claim, rejecting a contention that the FCC's "classifications based on alienage" violated *Equal Protection* principles. *Id.* at 1056.  The Commission says the case dealt with "paradigmatic speech activity."  (Opp. 20)  Not so.  The plaintiff in *Moving Phones* never raised a First Amendment claim, and neither the phrase "First Amendment" nor the word "speech" appears anywhere in the decision.  This is not surprising, because at issue was receipt of a government benefit—an FCC license—and the Supreme Court has long held that "[n]o one has a First Amendment right to a[n FCC] license," *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 389 (1969); *see also Ruggiero v. FCC*, 317 F.3d 239, 250 (D.C. Cir. 2003) (en banc) ("'No one has a First Amendment right to a license,' and it follows that no one has a First Amendment right to apply for a license." (citing *Red Lion Broad. Co.*, 395 U.S. at 389)).

The Commission's reliance on these cases simply highlights the lack of authority suggesting that aliens' political *speech* is protected by less than heightened scrutiny. Nothing in these cases (any more than in the other Equal Protection cases initially cited in the Commission's motion to dismiss) speaks to the permissibility of (or standard of scrutiny for) restrictions on aliens that implicate the Bill of Rights. They stand only for the proposition that it is permissible, under Equal Protection principles, to exclude aliens from government jobs that involve the exercise of sovereign authority. (SJ 51) In the Court's own description, the cases apply rational basis review to "exclusions that entrust only to citizens important elective and nonelective positions whose operations 'go to the heart of representative government.'" *Bernal v. Fainter*, 467 U.S. 216, 221 (1984) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982) (allowing distinctions between citizens and aliens with respect to "the establishment and operation of [a State's] own government, as well as the qualifications of an appropriately designated class of public office holders" (quoting *Sugarman*, 413 U.S. at 648)). They do not offer the slightest support for the proposition that aliens can be banned from any form of political speech on the odd theory that such speech is an attempt to participate in democratic "self-government."

### C.      The Restrictions of the Alien Gag Law Are Subject to Heightened Scrutiny.

Contrary to the Commission's unsupported position, § 441e's ban on independent expenditures is subject to strict scrutiny and its ban on contributions is subject at least to heightened scrutiny. This conclusion flows inexorably from clear Supreme Court precedent.

Resident aliens like Plaintiffs are fully protected by the First Amendment. "[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders," including "those protected by the First . . . Amendment[]." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Bridges v.*

*Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring).  Indeed, it is so "well settled that 'freedom of speech and of press is accorded aliens residing in this country,'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring in part and concurring in the judgment) (quoting *Bridges*, 326 U.S. at 148 (majority opinion)), that even the Commission concedes this point (Opp. 18 n.3, 22).  And the First Amendment requires that restrictions on political expenditures satisfy strict scrutiny, *Buckley*, 424 U.S. at 44-45; *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 461 (2007) (plurality opinion), while restrictions on political contributions must, at least, be "closely drawn" to accomplish a "sufficiently important interest." *Buckley*, 424 U.S. at 25.[4]

Each of the Alien Gag Law's restrictions, therefore, can survive only if it is justified by a sufficiently important government interest and is well-tailored to serve that interest.[5]

---

[4] Plaintiffs maintain that a complete ban on contributions is subject to strict scrutiny.  As the Commission notes (Opp. 31), the Court in *FEC v. Beaumont*, 539 U.S. 146 (2003), said that a complete ban need only be "closely drawn to match a sufficiently important interest." *Id.* at 161-62.  This was only dicta, however, given that the Court concluded in the next paragraph that the plaintiff was "simply wrong in characterizing [the statute] as a complete ban," *id.* at 162.  In any event, the precise level of heightened scrutiny is immaterial in light of the illegitimate *purpose* asserted by the Commission, as explained below.  *See* Part II, *infra*.

[5] The Commission attempts to characterize Plaintiff Steiman's proposed donation to the independent Club for Growth as a "contribution" rather than an "independent expenditure," citing the statutory definition of "contribution."  (Opp. 32 n.9)  But it is the *constitutional*, not the *statutory*, definition that determines the applicable level of scrutiny.  And *Buckley*'s unique treatment of "contributions" is premised upon "the perception of undue influence of large contributors *to a candidate*." *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 296-97 (1981) (emphasis added).  It therefore has no application to donations to independent political groups like the Club for Growth.  As the D.C. Circuit recently explained:  "After all, if one person is constitutionally entitled to spend $1 million to run advertisements supporting a candidate (as *Buckley* held), it logically follows that 100 people are constitutionally entitled to donate $10,000 each to a non-profit group that will run advertisements supporting a candidate." *Emily's List v. FEC*, 581 F.3d 1, 10 (D.C. Cir. 2009).

Incredibly, the Commission also objects that the Club for Growth states on its website that it does not accept donations from foreign nationals.  Might that be because the very law Plaintiffs challenge *criminalizes* it, and the Commission itself directs organizations to provide such disclaimers?  *See* FEC Advisory Op. 1995-09 ("The following cautionary language should be substituted . . . to let potential contributors know that the Act may affect . . . their ability to contribute: 'Sorry, Federal law prohibits foreign nationals who lack permanent residence status from contributing to NewtWatch.'").

Anyway, since Plaintiff Bluman seeks to make a classic independent expenditure by printing and distributing leaflets in a park, neither of these points ultimately matters to disposition of this case.

## II.        The Commission's Attempts To Satisfy Heightened Scrutiny Are Meritless.

In the alternative, the Commission takes a shot at defending the Alien Gag Law under heightened scrutiny.  (Opp. 32-52)  Disclaiming several possible purposes of the statute critiqued by Plaintiffs, the Commission's catch-phrase is preventing "foreign influence."   (Opp. 32) Standing alone, that is circular:  The reason for keeping aliens out of the discussion is to reduce their influence on the discussion.  But why?  The Commission's apparent answer is that resident aliens have a less substantial interest in participating in the discussion, and that adding their voices to the mix might affect the views of other participants.  But the Government's desire to silence truthful, influential speech about the Government by *persons protected by the First Amendment* is hardly a legitimate interest; it is the core evil that the First Amendment is designed to prevent.  And although the failure to identify a "sufficiently important interest" moots any questions of tailoring, the Commission's attempts to show that Congress carefully targeted § 441e at the evils of "foreign influence" actually prove just the opposite.

### A.        The Commission Expressly Disclaims a Series of Potential Rationales for the Alien Gag Law.

At the outset, it is worth recounting the possible purposes of the Alien Gag Law that the Commission *expressly disclaims*.   The Commission periodically alludes to the dangers of corruption, the overseas use of domestic conduits, and the harmful nature of foreign views. Perhaps because it realizes that the statute is not remotely tailored to target those things, however, it affirmatively abandons these concerns as the motivating rationales of § 441e. Because, under heightened scrutiny, the Commission must defend the law based on its actual rationale, the Commission's concessions considerably narrow this Court's inquiry.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

1.      *Anti-corruption*.  Plaintiffs pointed out that, to the extent that § 441e is intended to combat corruption (*i.e.*, actual "influence-buying"), it is vastly overinclusive.  Contribution *limits* could be imposed, as they are on citizens, but neither *expenditure* limits nor contribution *bans* are constitutionally permissible means of preventing corruption.  (SJ 42)  The Commission now expressly admits that § 441e "is not an anticorruption measure."  (Opp. 52)

2.      *Anti-circumvention*.  Plaintiffs also observed that, if § 441e is meant to prevent the use of residents as *conduits* for illegal spending by overseas actors who lack constitutional protections, it is not supported by a sufficient record of such circumvention and is anyway both underinclusive and overinclusive.  (SJ 43-46)  Among other things, another law already prohibits contributions by conduit, 2 U.S.C. § 441f, and (as the Commission concedes) overseas entities can just as easily funnel donations through "citizen . . . intermediaries" (Opp. 14).  In any case, the Commission now denies that the Alien Gag Law is an anti-circumvention statute.  Rather, as the Commission notes, before the enactment of § 441e, foreign entities were *already* banned from using domestic agents as conduits; thus, the law's purpose was to "reach direct spending," not the "indirect foreign spending that is also illegal under section 441f."  (Opp. 35)[6]

3.      *"Harmful" Views*.  Plaintiffs also contended that the statute could not be upheld as a means of protecting against damage that would supposedly result from the election of candidates backed by resident aliens.  (SJ 40-41)  The Government may only restrict dangerous speech if it is likely to produce "imminent lawless action," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam), a standard that could not possibly be met here.  Plaintiffs felt it necessary to make this point in light of the Commission's repeated invocations of the deference owed the political branches on matters of national security.  Indeed, the Commission continues to

---

[6] The Commission goes on to dispute Plaintiffs' argument that § 441e was not tailored to prevent circumvention of the ban on overseas contributions (Opp. 35-36), but if the statute was not motivated by anti-circumvention then it is irrelevant how well-tailored it is to that goal.  *See also* n.8, *infra*.

assert that § 441e "represents an exercise of the federal government's authority over the foreign affairs and national security of the United States."  (Opp. 13)  However, when the Commission attempts to defend § 441e based on doctrine (rather than diffuse fear-mongering), it expressly concedes that the law cannot meet the *Brandenburg* standard: "[S]ection 441e is not a regulation targeting advocacy that poses a threat of producing imminent lawless action."  (Opp. 30 n.7)  Rather, the law applies—intentionally so—to aliens "whether their views and objectives are innocuous or not."  (Opp. 28)  So, despite the Commission's continued attempts to wrap itself in the cloak of national security, § 441e is not really a harm-prevention statute either.

In light of these admissions, there is no need for this Court to determine whether, or to what extent, the alternative interests disclaimed by the Commission could justify the Alien Gag Law, *see Virginia*, 518 U.S. at 533—although it is clear that they could not.

### B.   The Government's Assertedly Compelling Interest in Preventing "Foreign Influence" Is *Per Se* Illegitimate Under the First Amendment.

Having clarified that § 441e is not intended to fight corruption, prevent circumvention, or protect national security, the Commission is unapologetically candid about its true goals.  The Government has decided that resident aliens have only a "small[] stake" in the question of who should govern the cities, states, and country in which they reside.  (Opp. 43)  They thus "have no legitimate role to play in American elections."  (Opp. 28)  And allowing them to do so would risk "injecting distinctly *foreign* influence into elections."  (Opp. 43)  While a resident alien might not be able "to drastically sway" the results of an election, his advocacy might "have *some* effect."  (Opp. 39)  In short, allowing resident aliens to make contributions and expenditures would allow them to *influence* the electorate, which must be stopped because their views are *foreign*.  To be clear, this is offered as a defense of the law *under heightened scrutiny*, which presumes that resident aliens do enjoy the constitutional right to engage in political advocacy.

The Commission is thus openly asserting the power to exclude constitutionally protected but politically disfavored groups from the political debate.  That is fundamentally inconsistent with the First Amendment, which "creates an open marketplace where ideas, most especially political ideas, may compete without government interference."  *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008).  Congress' intent to exclude resident aliens and their unworthy "foreign" views from the political marketplace of ideas is not an *answer* to the constitutional problem with § 441e; it *is* the constitutional problem with § 441e.

That the Government believes a class of speakers lacks a sufficient "stake" in the issue (Opp. 43), or "ha[s] no legitimate role to play" in the discourse (Opp. 28), is no basis for censorship; the First Amendment takes that determination out of government hands.  In the realm of political speech, "the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue."  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-85 (1978).  Rather, it is the *voters* who "are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments," and it is the *voters* who "may consider, in making their judgment, the source and credibility of the advocate."  *Id.* at 791-92.  (Disclosure rules, of course, are a legitimate means of assisting the *voters* in making those determinations, by providing them with additional information.  *See Citizens United*, 130 S. Ct. at 914-15.)

Nor does it matter that the speech might have an "effect" (Opp. 39) on the citizenry.  "[T]hat advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution 'protects expression which is eloquent no less than that which is unconvincing.'"  *Bellotti*, 435 U.S. at 791 (quoting *Kingsley Int'l Pictures Corp. v. Regents*, 360 U.S. 684, 689 (1959)).  Moreover, if the Commission is implying a "danger that the people cannot evaluate the

information and arguments advanced" by resident aliens, and will consequently make poor decisions, that "is a danger contemplated by the Framers of the First Amendment." *Id.* at 792. The Commission might lack faith in the American people, but "[t]hose who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

Just last year, the Supreme Court held that "restrictions distinguishing among different speakers, allowing speech by some but not others," are "[p]rohibited." *Citizens United*, 130 S. Ct. at 898.  In the face of that clear law, the Commission concedes that § 441e "is speaker-based."  (Opp. 50)  Seeking to distinguish *Citizens United*, the Commission argues that the ban on expenditures by corporations was invalidated only because it was motivated by an illicit "speech-equalization purpose," *i.e.*, an "attempt to enhance individual speech at the expense of corporate speech."  (Opp. 51)  But it was the speaker-based nature of the ban that was the problem with the statute, and the reason why it had to satisfy strict scrutiny.  130 S. Ct. at 898-99.  The Government's "antidistortion" interest in ensuring that corporations did not drown out other voices was simply one of (several) proffered *justifications* for the law that the Court rejected.  *Id.* at 903.  That the Government cannot even offer that defense here does not improve its argument.   If silencing certain speakers because they can "drown out" others is a constitutionally insufficient justification, then silencing certain speakers merely because of *who they are* is woefully deficient.  The Government would not have prevailed in *Citizens United* had it asserted an interest in silencing corporations because of distrust for their motives or a need to protect the electorate from "corporate influence."

In short, *Citizens United* is fatal for the Commission's argument.   There, the Court decried the ban on corporate expenditures as a law whose "purpose and effect are to silence entities whose voices the Government deems to be suspect."  *Id.* at 898.  The same is true here. There, the Court explained that "[b]y taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice."  *Id.* at 899.  The Government does no less here by silencing resident aliens.  There, the Court denied to the Government the "means [to] deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration."  *Id.*  It is just those determinations that § 441e here embodies.  And there, the Court concluded that it found "no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers."  *Id.* The same proposition dooms the Alien Gag Law here.

The Commission's "defense" of § 441e is thus no defense at all.  The "interest" in silencing selected voices is no more a valid justification for censorship under the First Amendment than an "interest" in keeping the races apart would be a valid justification for segregation under the Equal Protection Clause.

**C.   The Alien Gag Law's Blunderbuss Censorship Is Not Remotely Tailored to the Commission's Asserted Interest.**

Because the purpose offered by the Commission to justify the Alien Gag Law is plainly illegitimate, § 441e is invalid, as applied to resident aliens, regardless of its tailoring.  Yet, as Plaintiffs have explained (SJ 31-46), the law does not even have the virtue of being "closely drawn," *Buckley*, 424 U.S. at 25—let alone "narrowly tailored," *Wis. Right to Life*, 551 U.S. at 464—to any conceivable end.  The law bans *all* nonimmigrant aliens (no matter their status) from *all* countries (no matter how friendly to the U.S.) from making *any* contributions (no matter

how small) or *any* expenditures (no matter how independent) in relation to *any* election (no matter whether the alien may vote in it) in *any* jurisdiction within the United States (even if the State or city believes in a free marketplace of ideas and so imposes no contribution limits itself).[7] This is nothing like the "[p]recision of regulation" that must be "the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963).

Indeed, with respect to the tailoring of § 441e (or lack thereof), the Commission's own arguments for why the statute *is* closely drawn (to the illegitimate end of excluding non-constituents from political debate) are among the best examples for why it is *not*.

First, the Commission notes that § 441e does not apply to lawful permanent residents (LPRs).  (Opp. 41)   But LPRs have no more right to vote or otherwise participate in "self-government" than Plaintiffs.  The Commission says that LPRs "are in a categorically different legal position vis-à-vis the United States" (Opp. 43), but the distinctions between LPRs and non-permanent residents are overstated (as argued by *amicus* ICIRR) and, in any event, irrelevant to the stated purpose for § 441e: excluding from the political arena those individuals who do not hold the right to "self-government."  That is, the Commission claims that the Alien Gag Law was designed to "ensur[e] that government represents its constituency" (Opp. 26), yet Congress expressly permitted a large group of non-constituents (LPRs) to engage in speech that the Commission claims is "democratic self-government."  And Congress did so quite consciously, recognizing that the law "does not really close" the gap between voters and spenders.  (SJ 37)  It is precisely this sort of conscious underinclusion that calls into question whether "'the proffered state interest actually underlies the law.'"  (Opp. 44 (quoting *Blount v. SEC*, 61 F.3d 938, 946

---

[7] It is not clear where Congress even gets the power to enact a law regulating State and local elections.  The Constitution ordinarily mandates "state control over the election process for state offices." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986).  Even if Congress has the *power* to regulate speech relating to State elections, however, it surely has no legitimate interest in protecting States from speech that the States themselves have chosen to permit.

(D.C. Cir. 1995))); *see also Florida Star v. BJF*, 491 U.S. 524, 541-42 (1989) (Scalia, J.,

concurring in part and concurring in judgment) ("[A] law cannot be regarded as protecting an

interest 'of the highest order,' . . . when it leaves appreciable damage to that supposedly vital

interest unprohibited." (quoting *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979))).[8]

In fact, the legislative history indicates not that Congress drew a principled or defensible

line between LPRs and non-permanent residents, but rather that Congress was simply not

cognizant that many people lawfully live and work in the United States but are not classified as

LPRs under the immigration laws.  The floor exchange between Senators Bentsen and Cannon—

which the Commission ignores—makes this clear.  (SJ 18)  When the latter warned that the ban

would cover "a pretty substantial number of people who were here properly in this country . . .

who are not here as permanent residents," 120 Cong. Rec. 8783 (Mar. 28, 1974), and thus went

"further than would be intended by Members of this body if they were here to hear the discussion

on it," *id.* at 8784, the sponsor of the amendment reassured those present that the law "was

carefully drawn to try to exclude certain people who might be legally in this country passing

through here as tourists," *id.*  In other words, the amendment was written to ban spending by

aliens who were tourists or resided overseas, and to permit spending by LPRs, with no apparent

consideration for those who fall in between those categories.  The application of § 441e to non-

permanent residents like Plaintiffs was thus an oversight, not a manifestation of the careful

congressional tailoring necessary to survive heightened scrutiny.

---

[8] Although the Commission has denied that § 441e is intended to prevent the use of resident aliens as conduits, the failure to cover LPRs undermines that potential purpose as well.  As previously noted, overseas donors have long been prohibited from using agents in the U.S. to make political contributions.  And the more recent evidence of foreign contributions cited by the Commission (though not, apparently, by the Congress that enacted § 441e) involved conduits who were either citizens or LPRs.  It would be bizarre if § 441e were intended to target contributions by conduit but Congress had excluded the class of aliens supposedly engaged in the problem while including the class that was not.  (The Commission implies that Ted Sioeng was a non-permanent resident (Opp. 15), but this is misleading; the source cited by the Commission states that he was not a resident at all.  *See* S. Rep. No. 105-167 at 5573, *available at* http://www.fas.org/irp/congress/1998_rpt/sgo-sir/4-7.htm (describing Sioeng "an Indonesian-born businessman who is not a U.S. citizen or a legal resident"); *id.* at 965, *available at* http://www.fas.org/irp/congress/1998_rpt/sgo-sir/1-12.htm (describing Sioeng as "originally from Indonesia, [and] a citizen of Belize who splits his time between Singapore and Hong Kong").)

Second, the Commission contends that § 441e is well-tailored because it permits resident aliens to engage in issue advocacy, including with respect to ballot initiatives. (Opp. 45-46)  But it similarly fails to offer any explanation for why, if the ban on election advocacy is necessary to further Congress's "fundamental obligation" of "ensuring that government represents its constituency" (Opp. 26), the statute carves out aliens' advocacy regarding ballot initiatives.  Like permanent residents' election advocacy, aliens' advocacy with respect to ballot initiatives involves the participation of non-constituents in what the Commission claims are acts of "self-government" that must be reserved for constituents.  Indeed, ballot initiatives—which create positive law *directly*—implicate democracy and self-government far more powerfully than the election of candidates to public office, who only later proceed to draft and enact laws.  According to the Commission, § 441e's acceptance of alien advocacy regarding ballot initiatives does not call into question Congress's goal because Congress had not been presented with any evidence about aliens' attempts to influence such initiatives.  (Opp. 46)  Apparently Congress saw fit to generalize and extrapolate from Nazi propaganda, Chinese government meddling, and a few episodes of campaign contributions from overseas (Opp. 14-15), none of which involved resident aliens, in enacting a wide-ranging ban that prevents resident aliens, no matter their nationality, from contributing or independently advocating for candidates—but then arbitrarily drew a line in the sand when it came to ballot initiatives, demanding specific evidence before taking action.[9]   Again, this demonstrates the opposite of careful tailoring: unreasoned and arbitrary line-drawing.

---

[9] The Commission also attempts to justify this disparate statutory treatment by adverting to the Supreme Court's own disparate treatment of contributions to candidates versus contributions to ballot-initiative committees. (Opp. 46)  The *basis* for that distinction, however, is that the "risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Bellotti*, 435 U.S. at 790 (citations omitted) (cited in *Citizens Against Rent Control*, 454 U.S. at 298).  The Commission, having disclaimed any anti-corruption motive behind § 441e, *see* Part II.A, *supra*, cannot rely on a corruption theory to justify the law's underinclusivity; and with respect to the interest the Commission *has* asserted, there is no reason to distinguish between spending on candidate advocacy and spending on ballot initiatives.

**III.    The Commission Continues To Argue from Consequences That Do Not Follow from Plaintiffs' Position.**

The Commission continues to suggest that vindicating Plaintiffs' well-established First Amendment rights to political speech would require recognition of the same rights for illegal aliens and foreign corporations.  (Opp. 39-40)  Yet, unlike with respect to resident aliens, no court (to Plaintiffs' knowledge) has held that these groups generally possess First Amendment rights; the Supreme Court has pointedly stopped short of so holding; and nothing in Plaintiffs' arguments would require a different course.  There are compelling reasons to treat lawful resident aliens differently from illegal aliens and foreign corporations, and the Commission's strategic blindness to these distinctions ought not confuse this Court about the scope of Plaintiffs' claim or reasoning.  Nor is the Commission's attack on the soundness of the Supreme Court's *Verdugo-Urquidez* precedent any basis for this Court to ignore Plaintiffs' rights.

As to foreign corporations, the Commission complains that "Plaintiffs fail . . to offer any principled distinction between themselves and foreign corporations transacting business domestically."  (Opp. 38)  But Plaintiffs *have* offered a distinction:  Foreign corporations, in contrast to Plaintiffs, are not "residents" of the United States under *Verdugo-Urquidez*.  (SJ 56 ("[I]f Plaintiffs are correct that natural persons residing in the United States are protected by the First Amendment, the same does not necessarily follow for corporations—fictional persons— that are incorporated in foreign countries."))  They therefore lack First Amendment rights at the threshold, and so their speech can be freely regulated.  Plaintiffs are unaware of any case finding to the contrary, and the Supreme Court has plainly left open such a position.  *Citizens United*, 130 S. Ct. at 911.  In light of this authority, the Commission's assertion that there is no "principled" distinction between aliens residing in the United States, on the one hand, and corporations created and registered overseas, on the other, seems disingenuous.  If Plaintiffs

prevail in this action, would the Commission really concede in a later case that foreign corporations are necessarily "residents" of the United States?

Likewise, nothing in Plaintiffs' position would require the Court to recognize the political speech rights of illegal aliens.  In *Verdugo-Urquidez*, the Court went out of its way to cast doubt on the argument that illegal aliens qualify as members of "the people" protected by the First and Fourth Amendments.  494 U.S. at 272.  Indeed, Justice Stevens criticized the Court for its (in his view) unnecessary "comment" on the rights of illegal aliens.  *Id.* at 279 n.* (Stevens, J., concurring in the judgment).  Moreover, there is an obvious basis to distinguish between lawful resident aliens and those unlawfully present:  A member of the latter is not present pursuant to any mutual "compact" with the United States.  *Id.* at 264 (majority opinion); *id.* at 265 ("[An e]xcludable alien is not entitled to First Amendment rights, because '[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law.'" (quoting *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904))).  Lower courts have followed the Supreme Court's lead on this issue.  *See United States v. Esparza-Mendoza*, 265 F. Supp. 2d 1254, 1270 (D. Utah 2003) (Cassell, J.) ("An illegal alien . . . is not entitled to First Amendment rights.").  And, indeed, the Government itself has zealously advanced the argument that illegal aliens are constitutionally distinguishable from lawful resident aliens.  *See United States v. Guitterez*, 983 F. Supp. 905, 914 (N.D. Cal. 1998) ("In the instant case, the Government contends that the clear 'thrust' of *Verdugo-Urquidez* and [*United States v.*] *Barona*[, 56 F.3d 1087, 1093 (9th Cir. 1995)] is that 'an illegal alien . . . should not be granted Fourth Amendment protections.'").  All of this fatally belies the Commission's suggestion that no such distinction can tenably be drawn.

More generally, the Commission attacks (without offering any alternative) the *Verdugo-Urquidez* framework—under which residents of the United States hold "sufficient connection with this country" to qualify as among "the people" protected by the First and Fourth Amendments, 494 U.S. at 265, 271—as "so vague as to be meaningless as a limiting principle." (Opp. 37)   As a threshold matter, the Commission's criticisms are no basis for this Court to disregard binding precedent.   Anyway, the Court's test strikes an intuitive balance between two unacceptable extremes: holding that everyone who sets foot in the country is entitled to the full panoply of constitutional protections, on the one hand; and restricting core constitutional protections exclusively to citizens, on the other.   Granted, the Court adopted a *standard* rather than a bright-line *rule*, but that is common (if not the norm) in the sensitive First Amendment context.   *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (plurality opinion) (assessing validity of contribution limit by inquiring whether it poses "constitutional risks to the democratic electoral process" that are "too great"); *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (classifying conduct as expressive if it "possesses sufficient communicative elements to bring the First Amendment into play"); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969) (holding that speech in schools can be restricted if it "materially disrupts classwork or involves substantial disorder"); *see also Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994) (requiring minority plaintiff challenging redistricting plan to demonstrate possibility of additional "reasonably compact districts" with "sufficiently large minority population[s]").   Indeed, even as the Commission criticizes the Supreme Court's *Verdugo-Urquidez* "sufficient connection" standard as too malleable (Opp. 37), it simultaneously argues that complete bans on political contributions should be upheld if they are closely drawn to further a "sufficiently important interest" (Opp. 30 (quoting *Buckley*, 424 U.S. at 25) (internal quotation marks omitted)).

Here, because Plaintiffs present only an as-applied challenge, this Court need go no further than to declare what the Commission cannot and does not dispute: that Plaintiffs—as aliens who lawfully live, work, and pay taxes in the United States—plainly satisfy the *Verdugo-Urquidez* standard.  The fact that one might reasonably interpret the Supreme Court's test more generously is irrelevant; doubts about the outer boundaries of the First Amendment's scope are surely no basis to deny constitutional freedoms to aliens who indisputably fall within it.

## **CONCLUSION**

Plaintiffs respectfully request that this Court enter summary judgment in their favor.

Dated: March 28, 2011

Respectfully submitted,

/s/ Jacob M. Roth

Jacob M. Roth (D.C. Bar No. 995090)
Warren D. Postman (D.C. Bar No. 995083)
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
yroth@jonesday.com
wpostman@jonesday.com

**Counsel for Plaintiffs**