UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Benjamin Bluman and Asenath Steiman,
      Plaintiffs,

v.

Federal Election Commission,
      Defendant.

Civil No. 10-1766 (BMK)(RMU)(RMC)

Three-Judge Court

Before: KAVANAUGH, Circuit Judge; URBINA, District Judge; and COLLYER, District Judge.

**MEMORANDUM OPINION**

KAVANAUGH, Circuit Judge:

Plaintiffs are foreign citizens who temporarily live and work in the United States. They are neither U.S. citizens nor lawful permanent residents; rather, they are lawfully in the United States on temporary work visas. Although they are not U.S. citizens and are in this country only temporarily, plaintiffs want to participate in the U.S. campaign process. They seek to donate money to candidates in U.S. federal and state elections, to contribute to national political parties and outside political groups, and to make expenditures expressly advocating for and against the election of candidates in U.S. elections. Plaintiffs are barred from doing so, however, by federal statute. *See* 2 U.S.C. § 441e(a).

In this suit, plaintiffs argue that the federal ban on their proposed activities is unconstitutional. Plaintiffs contend, in particular, that foreign citizens lawfully resident in the United States have a right under the First Amendment to the United States Constitution to

1

contribute to candidates and political parties and to make express-advocacy expenditures. We respect the force of plaintiffs' arguments, as ably advanced by plaintiffs' counsel. Under the relevant Supreme Court precedents, however, we must disagree with plaintiffs' submission. The Supreme Court has long held that the government (federal, state, and local) may exclude foreign citizens from activities that are part of democratic self-government in the United States. For example, the Supreme Court has ruled that the government may bar aliens from voting, serving as jurors, working as police or probation officers, or teaching at public schools. Under those precedents, the federal ban at issue here readily passes constitutional muster. We therefore grant the FEC's motion to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6), and we deny plaintiffs' motion for summary judgment.[1]

## LEGAL BACKGROUND

As political campaigns grew more expensive in the latter half of the 20th Century, especially with the advent of costly television advertising, money became more important to the campaign process – in terms of both contributions to candidates and political parties and expenditures advocating for or against candidates. As money became more important to the election process, concern grew that foreign entities and citizens might try to influence the outcome of U.S. elections. In 1966, Congress sought to limit foreign influence over American elections by prohibiting agents of foreign governments and entities from making contributions to candidates. *See* Pub. L. No. 89-486, § 8, 80 Stat. 244, 248-49 (1966). In 1974, Congress expanded that ban and barred contributions to candidates from all "foreign nationals," defined as

---

[1] In this opinion, we follow Supreme Court practice and use the terms "foreign citizen" and "alien" interchangeably to refer to individuals who are not citizens of the United States. As we use them here, those terms do not include individuals who are dual citizens of a foreign country and the United States. The term "foreign national" is a statutory term of art and has a narrower scope: It covers foreign citizens except for lawful permanent residents of the United States. *See* 2 U.S.C. § 441e(b).

2

all foreign citizens except lawful permanent residents of the United States. *See* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, § 101(d), 88 Stat. 1263, 1267.

But those restrictions did not eliminate the possibility of foreign citizens influencing American elections by, for example, soft-money donations to political parties as opposed to direct contributions to candidates. Activities by foreign citizens in the 1996 election cycle sparked public controversy and an extensive investigation by the Senate Committee on Governmental Affairs. The Committee found that foreign citizens had used soft-money contributions to political parties to essentially buy access to American political officials. *See* S. REP. NO. 105-167, at 781-2710, 4619-5925 (1998). It also found that the Chinese government had made an effort to "influence U.S. policies and elections through, among other means, financing election campaigns." *Id.* at 47; *see also id.* at 2501-12.

In response, Congress eventually passed and President George W. Bush signed legislation that, among many other things, strengthened the prohibition on foreign financial involvement in American elections. *See* Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, § 303, 116 Stat. 81, 96. This new Act expanded the ban on foreign nationals' financial influence on elections by banning foreign nationals both from making expenditures and from making contributions to political parties, thus supplementing the pre-existing ban on foreign nationals making contributions to candidates.

The relevant provision of the statute as amended in 2002 reads:

**(a) Prohibition**

It shall be unlawful for–

(1) a foreign national, directly or indirectly, to make–

3

(A) a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

(B) a contribution or donation to a committee of a political party; or

(C) an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 434(f)(3) of this title); or

(2) a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

2 U.S.C. § 441e(a).[2] The statute continues to define "foreign national" to include all foreign citizens except those who have been admitted as lawful permanent residents. *Id.* § 441e(b).

As relevant here, we interpret the statute to bar foreign nationals – that is, all foreign citizens except those who have been admitted as lawful permanent residents of the United States – from contributing to candidates or political parties; from making expenditures to expressly advocate the election or defeat of a political candidate; and from making donations to outside groups when those donations in turn would be used to make contributions to candidates or parties or to finance express-advocacy expenditures. *See generally FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007); *Emily's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009). This statute, as we interpret it, does not bar foreign nationals from issue advocacy – that is, speech that does not expressly advocate the election or defeat of a specific candidate. The line between prohibited express-advocacy expenditures and permitted issue-advocacy expenditures for purposes of this

---

[2] The statute as amended defines "contribution" as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office" or "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose." 2 U.S.C. § 431(8)(A). The statute as amended defines "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office" or any "written contract, promise, or agreement to make an expenditure." *Id.* § 431(9)(A). An "independent expenditure" is "an expenditure by a person . . . expressly advocating the election or defeat of a clearly identified candidate" that is not made in coordination with that candidate. *Id.* § 431(17).

statute is the line drawn by the Supreme Court in *Wisconsin Right to Life*: An express-advocacy expenditure is one that funds "express campaign speech" or its "functional equivalent." 551 U.S. at 456 (controlling opinion of Roberts, C.J.). An advertisement is the "functional equivalent" of express advocacy if it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469-70.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs in this suit – Benjamin Bluman and Asenath Steiman – are foreign citizens who live and work in the United States on temporary visas. Bluman is a Canadian citizen who has lawfully resided in the United States since November 2009 on a temporary work visa. From September 2006 to June 2009, he lawfully resided in the United States on a temporary student visa while attending law school. His current visa will allow him to stay in the country until November 2012, at which time he plans to apply for a second three-year term. He is an associate at a law firm in New York City.

Bluman wants to contribute to three candidates: Representative Jay Inslee of Washington; Diane Savino, a New York state senator; and President Obama. He also wants to print flyers supporting President Obama's reelection and to distribute them in Central Park.

Steiman is a dual citizen of Canada and Israel. She has a temporary visa authorizing her to live and work in the United States for a period of three years, through June 2012, but that term could be extended for up to seven years. She is a medical resident at a hospital in New York.

Steiman wants to contribute money to Senator Tom Coburn; a yet-to-be-determined candidate for the Republican nomination for President in 2012; the National Republican

Senatorial Committee; and the Club for Growth, an independent organization that advocates with respect to certain issues and candidates.

All of plaintiffs' desired activities are barred by 2 U.S.C. § 441e(a) as amended in 2002.

Plaintiffs filed this complaint alleging that the statutory bar on their proposed activities violates the First Amendment to the United States Constitution. The Federal Election Commission moved to dismiss the suit for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). Plaintiffs moved for summary judgment.

## DISCUSSION

### I. Standard of Scrutiny

Political contributions and expenditures are acts of political expression and association protected by the First Amendment. According to plaintiffs, regulation of those activities therefore must meet First Amendment strict scrutiny standards. *See Buckley v. Valeo*, 424 U.S. 1, 25 (1976). The FEC counters that § 441e(a) manifests a congressional judgment on a matter of foreign affairs and national security, and is thus subject to deferential rational basis review. We think the question is somewhat more complex than either side suggests, not only because the statute implicates both the First Amendment and national security, but also because it includes both a limit on contributions and a limit on expenditures, which have traditionally been subject to different levels of First Amendment scrutiny. *See McConnell v. FEC*, 540 U.S. 93, 134-37 (2003); *Buckley*, 424 U.S. at 20-23, 44-45. But the debate over the level of scrutiny is ultimately not decisive here because we conclude that § 441e(a) passes muster even under strict scrutiny. Therefore, we may assume for the sake of argument that § 441e(a)'s ban on political contributions and expenditures by foreign nationals is subject to strict scrutiny.

In order to pass muster under strict scrutiny, a statute must be narrowly tailored to advance a compelling government interest. *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (controlling opinion of Roberts, C.J.). Plaintiffs contend that § 441e(a) cannot satisfy that exacting standard. We disagree.

## II. The Merits

Over the last four decades, the First Amendment issues raised by campaign finance laws have been the subject of great debates involving all three branches of the national government. *See, e.g., Citizens United v. FEC*, 130 S. Ct. 876 (2010); *Buckley v. Valeo*, 424 U.S. 1 (1976). This case does not implicate those debates. Rather, this case raises a preliminary and foundational question about the definition of the American political community and, in particular, the role of foreign citizens in the U.S. electoral process.

We know from more than a century of Supreme Court case law that foreign citizens in the United States enjoy many of the same constitutional rights that U.S. citizens do. For example, aliens are generally entitled to the same rights as U.S. citizens in the criminal process, among several other areas. *See, e.g., United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (aliens protected by the Constitution "when they have come within the territory of the United States and developed substantial connections with this country"); *Plyler v. Doe*, 457 U.S. 202, 210-12 (1982) (illegal aliens protected by Equal Protection Clause in the context of public education); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (Fifth and Fourteenth Amendments protect all aliens within the jurisdiction of the United States, even those "whose presence in this country is unlawful, involuntary, or transitory," from "deprivation of life, liberty, or property without due process of law"); *Sugarman v. Dougall*, 413 U.S. 634, 641-42 (1973) (aliens protected by Equal

Protection Clause from exclusion from the state civil service); *In re Griffiths*, 413 U.S. 717, 719-20, 722 (1973) (resident alien protected by the Fourteenth Amendment in the context of admission to the bar); *Graham v. Richardson*, 403 U.S. 365, 371-77 (1971) (lawfully admitted resident aliens protected by Equal Protection Clause in the context of state welfare laws); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (illegal aliens already in the United States entitled to due process before deportation); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596-98 (1953) (lawful permanent resident alien protected by the Fifth Amendment in the context of expulsion and deportation); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens protected by the First Amendment in the context of deportation); *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489 (1931) (Just Compensation Clause of Fifth Amendment applies to foreign corporation); *Home Ins. Co. v. Dick*, 281 U.S. 397, 411 (1930) (protection of the Fourteenth Amendment extends to aliens in the context of contract dispute); *Truax v. Raich*, 239 U.S. 33, 39-40 (1915) (Equal Protection Clause protects resident aliens in the "conduct of ordinary private enterprise"); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (illegal alien protected by the Fifth and Sixth Amendments from "imprisonment at hard labor" without trial by jury before deportation); *Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893) (resident aliens protected by the Constitution "in regard to their rights of person and of property, and to their civil and criminal responsibility"); *Yick Wo v. Hopkins*, 118 U.S. 356, 368-74 (1886) (resident aliens protected by the Fourteenth Amendment from discriminatory enforcement of public safety ordinances).

But we also know from Supreme Court case law that foreign citizens may be denied certain rights and privileges that U.S. citizens possess. For example, the Court has ruled that government may bar foreign citizens from voting, serving as jurors, working as police or

probation officers, or working as public school teachers. *See Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) (upholding a law barring foreign citizens from working as probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding a law barring foreign citizens from teaching in public schools unless they intend to apply for citizenship); *Foley v. Connelie*, 435 U.S. 291 (1978) (upholding a law barring foreign citizens from serving as police officers); *Perkins v. Smith*, 370 F. Supp. 134 (D. Md. 1974), *aff'd* 426 U.S. 913 (1976) (upholding a law barring foreign citizens from serving as jurors); *Sugarman*, 413 U.S. at 648-49 ("citizenship is a permissible criterion for limiting" the "right to vote or to hold high public office"). The Court has further indicated that aliens' First Amendment rights might be less robust than those of citizens in certain discrete areas. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952) (First Amendment does not protect aliens from deportation because of membership in the Communist Party). Beyond that, the Constitution itself of course bars foreign citizens from holding certain offices. *See* U.S. CONST. art. I, §§ 2, 3; U.S. CONST. art. II, § 1.

In those many decisions, the Supreme Court has drawn a fairly clear line: The government may exclude foreign citizens from activities "intimately related to the process of democratic self-government." *Bernal v. Fainter*, 467 U.S. 216, 220 (1984); *see also Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991); *Cabell*, 454 U.S. at 439-40. As the Court has written, "a State's historical power to exclude aliens from participation in its democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of a political community." *Foley*, 435 U.S. at 295-96 (internal quotation marks and citation omitted). In other words, the government may reserve "participation in its democratic political institutions" for citizens of this country. *Id.* When reviewing a statute barring foreign citizens from serving as probation officers, the Court explained that the "exclusion of aliens from basic governmental

9

processes is not a deficiency in the democratic system but *a necessary consequence of the community's process of political self-definition."* *Cabell*, 454 U.S. at 439 (emphasis added). Upholding a statute barring aliens from teaching in public schools, the Court reasoned that the "distinction between citizens and aliens, though ordinarily irrelevant to private activity, is *fundamental to the definition and government of a State*. . . . It is because of this special significance of citizenship that governmental entities, when exercising the functions of government, have wider latitude in limiting the participation of noncitizens." *Ambach*, 441 U.S. at 75 (emphasis added). And in upholding a ban on aliens serving as police officers, the Court stated that, "although we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens." *Foley*, 435 U.S. at 297.

We read these cases to set forth a straightforward principle: It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government. It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process.

Applying the Supreme Court's precedents, the question here is whether political contributions and express-advocacy expenditures – including donations to outside groups that in turn make contributions or express-advocacy expenditures, *see Emily's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009) – constitute part of the process of democratic self-government. In our view, the answer to that question is straightforward: Political contributions and express-advocacy

10

expenditures are an integral aspect of the process by which Americans elect officials to federal, state, and local government offices. Political contributions and express-advocacy expenditures finance advertisements, get-out-the-vote drives, rallies, candidate speeches, and the myriad other activities by which candidates appeal to potential voters. *See generally Buckley*, 424 U.S. at 14. We think it evident that those campaign activities are part of the overall process of democratic self-government. Moreover, it is undisputed that the government may bar foreign citizens from voting and serving as elected officers. *See Sugarman*, 413 U.S. at 647-49. It follows that the government may bar foreign citizens (at least those who are not lawful permanent residents of the United States) from participating in the campaign process that seeks to influence how voters will cast their ballots in the elections. Those limitations on the activities of foreign citizens are of a piece and are all "part of the sovereign's obligation to preserve the basic conception of a political community." *Foley*, 435 U.S. at 295-96 (internal quotation marks omitted).[3]

Our task here is made simpler because the Supreme Court has deemed the activities of democratic self-government to include functions as unrelated to the electoral process as teaching in public schools and serving as police and probation officers. *See Cabell*, 454 U.S. at 444-47; *Ambach*, 441 U.S. at 75-81; *Foley*, 435 U.S. at 297-300. In our view, spending money to influence voters and finance campaigns is at least as (and probably far more) closely related to democratic self-government than serving as a probation officer or public schoolteacher. Thus, our conclusion here follows almost *a fortiori* from those cases.

For their part, plaintiffs concede that the government may bar foreign citizens *abroad* from making contributions or express-advocacy expenditures in U.S. elections. They thus

---

[3] We note that plaintiffs have not attempted to argue as a backup that they may have a right to make expenditures even if they do not have a right to make contributions. We think that a wise approach. The constitutional distinction between contributions and expenditures is based on the government's anti-corruption interest. *See Buckley*, 424 U.S. at 45-47. But that is not the governmental interest at stake in this case. Here, the government's interest is in preventing foreign influence over U.S. elections.

11

concede that the government may make distinctions based on the foreign identity of the speaker when the speaker is abroad. Plaintiffs contend, however, that the government may not impose the same restrictions on foreign citizens who are lawfully present in the United States on a temporary visa. We disagree.

Although the Supreme Court has never squarely addressed the issue presented in this case, the only four justices who spoke to the question in *Citizens United* indicated that the government obviously has the power to bar foreign nationals from making campaign contributions and expenditures. Justice Stevens wrote for those four justices:

> The Government routinely places special restrictions on the speech rights of students, prisoners, members of the Armed Forces, foreigners, and its own employees. . . . Although we have not reviewed them directly, we have never cast doubt on laws that place special restrictions on campaign spending by foreign nationals. See, *e.g.*, 2 U.S.C. § 441e(a)(1). . . . The Court all but confesses that a categorical approach to speaker identity is untenable when it acknowledges that Congress might be allowed to take measures aimed at "preventing foreign individuals or associations from influencing our Nation's political process." *Ante*, at 911. Such measures have been a part of U.S. campaign finance law for many years. The notion that Congress might lack the authority to distinguish foreigners from citizens in the regulation of electioneering would certainly have surprised the Framers, whose obsession with foreign influence derived from a fear that foreign powers and individuals had no basic investment in the well-being of the country.

*Citizens United*, 130 S. Ct. at 945, 947, 948 n.51 (Stevens, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in part and dissenting in part) (internal quotation marks and footnotes omitted). For Justices Stevens, Ginsburg, Breyer, and Sotomayor, it was plain – indeed, beyond rational debate – that the government may bar foreign contributions and expenditures. To be sure, the other five Justices did not have occasion to expressly address this issue in *Citizens United*, but the majority's analysis in *Citizens United* certainly was not in conflict with Justice Stevens's conclusion on this particular question about foreign influence. Indeed, in our view, the majority opinion in *Citizens United* is entirely consistent with a ban on foreign contributions and

12

expenditures. And we find the force of Justice Stevens's statement to be a telling and accurate indicator of where the Supreme Court's jurisprudence stands on the question of foreign contributions and expenditures.

Plaintiffs try in various ways to overcome the relevant Supreme Court precedents. First, they acknowledge that they do not have the right to vote in U.S. elections, but they contend that the right to *speak* about elections is different from the right to *participate* in elections. But in this case, that is not a clear dichotomy. When an expressive act is directly targeted at influencing the outcome of an election, it is both speech and participation in democratic self-government. Spending money to contribute to a candidate or party or to expressly advocate for or against the election of a political candidate is participating in the process of democratic self-government. Notably, § 441e(a) as we interpret it, *see supra* pp. 4-5, does not restrain foreign nationals from speaking out about issues or spending money to advocate their views about issues. It restrains them only from a certain form of expressive activity closely tied to the voting process – providing money for a candidate or political party or spending money in order to expressly advocate for or against the election of a candidate. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 788 n.26 (1978) ("speak[ing] on issues of general public interest" is a "quite different context" from "participation in a political campaign for election to public office").

Plaintiffs further contend that § 441e(a)'s restrictions on contributions and expenditures cannot be justified by the longstanding ban on foreign citizens voting in U.S. elections because the statutory restrictions here are not tied to the right to vote. But that argument misunderstands the compelling interest that is at stake. The statute does not serve a compelling interest in limiting the participation of *non-voters* in the activities of democratic self-government; it serves the compelling interest of limiting the participation of *non-Americans* in the activities of

13

democratic self-government. A statute that excludes foreign nationals from political spending is therefore tailored to achieve that compelling interest.

Plaintiffs also point out that many groups of people who are not entitled to vote may nonetheless make contributions and expenditures related to elections -- for example, minors, American corporations, and citizens of states or municipalities other than the state or municipality of the elective office. But minors, American corporations, and citizens of other states and municipalities are all members of the American political community. By contrast, the Supreme Court has said that "[a]liens are by definition those outside of this community." *Cabell*, 454 U.S. at 439-40. The compelling interest that justifies Congress in restraining foreign nationals' participation in American elections -- namely, preventing foreign influence over the U.S. government -- does not apply equally to minors, corporations, and citizens of other states and municipalities. It is long established that the government's legislative and regulatory prerogatives are at their apex in matters pertaining to alienage. *See Mathews*, 426 U.S. at 79-80; *Harisiades*, 342 U.S. at 588-89. It is hardly surprising, therefore, that a law that is justified as applied to aliens may not be justified as applied to citizens of the United States, or entities made up of such citizens. Thus, the fact that those other non-voting groups of U.S. citizens are free to contribute and make expenditures does not mean that foreign nationals are similarly entitled.

Plaintiffs argue that the statute, as a measure designed to limit foreign influence over American self-government, is underinclusive and not narrowly tailored because it does not prohibit contributions and expenditures by lawful permanent residents. But as Members of Congress stated when rejecting a proposal to include lawful permanent residents in § 441e(a)'s prohibition, *see, e.g.*, 148 Cong. Rec. H448-H450 (Feb. 13, 2002) (statements of Reps. Mink, Menendez, Reyes, Morella, and Solis), Congress may reasonably conclude that lawful permanent

14

residents of the United States stand in a different relationship to the American political community than other foreign citizens do. Lawful permanent residents have a long-term stake in the flourishing of American society, whereas temporary resident foreign citizens by definition have only a short-term interest in the national community. Indeed, at oral argument in this case, plaintiffs' counsel could not say that the two plaintiffs here ever want to become U.S. citizens, or to apply for lawful permanent residency. *See* Tr. of Oral Arg. at 19. Temporary resident foreign citizens by definition have primary loyalty to other national political communities, many of which have interests that compete with those of the United States. Apart from that, lawful permanent residents share important rights and obligations with citizens; for example, lawful permanent residents may – and do, in large numbers – serve in the United States military. In those two ways – their indefinite residence in the United States and their eligibility for military service – lawful permanent residents can be viewed as more similar to citizens than they are to temporary visitors, and thus Congress's decision to exclude them from the ban on foreign nationals' contributions and expenditures does not render the statute underinclusive. In fact, one might argue that Congress's carve-out for lawful permanent residents makes the statute more narrowly tailored to the precise interest that it is designed to serve – namely, minimizing *foreign* participation in and influence over American self-government.

Plaintiffs further contend that the statute is underinclusive and not narrowly tailored because it permits foreign nationals to make contributions and expenditures related to ballot initiatives. But as the Supreme Court has stated, Congress may proceed piecemeal in an area such as this involving distinctions between citizens and aliens. *See Buckley*, 424 U.S. at 105 (noting the "familiar principles that a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time,

and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind") (internal quotations marks and citations omitted); *Mathews*, 426 U.S. at 82-84 ("Since it is obvious that Congress has no constitutional duty to provide *all aliens* with the welfare benefits provided to citizens, the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others. . . . When this kind of policy choice must be made, we are especially reluctant to question the exercise of congressional judgment."). Moreover, Congress could reasonably conclude that the risk of undue foreign influence is greater in the context of candidate elections than it is in the case of ballot initiatives. *Cf. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 299 (1981). Congress's determination that foreign contributions and expenditures pose a greater risk in relation to candidate elections than such activities pose in relation to ballot initiatives is a sensible one and, in our view, does not undermine the validity of the statutory ban on contributions and expenditures.

Plaintiffs also suggest that Congress's ban on foreign participation in the campaign process is the product of jingoistic sentiment in the United States Congress and thus should not be accepted by the courts. To begin with, Congress's most recent legislation on this issue was based on a factual record collected in the aftermath of the 1996 elections and Congress's genuine concern about foreign influences on U.S. elections. It bears mentioning, moreover, that plaintiffs' home countries – Israel and Canada – and many other democratic countries impose similar restraints on political spending by foreign citizens. *See, e.g.*, Canada Elections Act, 2000 S.C., c. 9 §§ 358, 404(1); Knesset Election Law (Consolidated Version), 5729-1969, 23 LSI 110

(5729-1968/69), as amended; *see also* Tr. of Oral Arg. at 56-57. To be sure, the United States protects speech and expression more than most (perhaps more than all) foreign countries do, and U.S. courts should not be bound by foreign nations' practices when analyzing constitutional issues such as this. But as the examples of Canada and Israel help show, distinguishing citizens from non-citizens in this context is hardly unusual or deserving of scorn; rather, it is part of a common international understanding of the meaning of sovereignty and shared concern about foreign influence over elections.

For all of those reasons, we are ultimately unpersuaded by plaintiffs' submission.[4] That said, we note three important limits to our holding in this case. First, we do not here decide whether Congress could constitutionally extend the current statutory ban to lawful permanent residents who have a more significant attachment to the United States than the temporary resident plaintiffs in this case. Any such extension would raise substantial questions not raised by this case. Second, we do not decide whether Congress could prohibit foreign nationals from engaging in speech other than contributions to candidates and parties, express-advocacy expenditures, and donations to outside groups to be used for contributions to candidates and parties and express-advocacy expenditures. Plaintiffs express concern, for example, that a ruling against them here would green-light Congress to impose bans on lobbying by aliens temporarily in this country. They similarly express concern that Congress might bar them from issue advocacy and speaking out on issues of public policy. Our holding does not address such questions, and our holding should not be read to support such bans. Third, we caution the government that seeking criminal penalties for violations of this provision – which requires that

---

[4] Our holding means, of course, that foreign corporations are likewise barred from making contributions and expenditures prohibited by 2 U.S.C. § 441e(a). Because this case concerns individuals, we have no occasion to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis.

17

the defendant act "willfully," *see* 2 U.S.C. §§ 437g(a)(5)(C), 437g(d)(1)(A) – will require proof of the defendant's knowledge of the law. *See United States v. Moore*, 612 F.3d 698, 702-04 (D.C. Cir. 2010) (Kavanaugh, J., concurring); *see also Staples v. United States*, 511 U.S. 600 (1994). There are many aliens in this country who no doubt are unaware of the statutory ban on foreign *expenditures*, in particular.

## CONCLUSION

We grant the FEC's motion to dismiss, and we deny plaintiffs' motion for summary judgment.

This the 8th day of August, 2011.

_____
BRETT M. KAVANAUGH
United States Circuit Judge

_____
RICARDO M. URBINA
United States District Judge

_____
ROSEMARY M. COLLYER
United States District Judge